44 F.3d 48
 Robert L. SCHULZ; Dorothy-Louise H. Brokaw; William Van
Allen; Lloyd Wright; Libertarian Party of New
York, Plaintiffs-Appellees,
Carol Berman; Owen T. Smith; Evelyn J. Aquila; Helena M.
Donohue, each individually and in their capacities
as Commissioners of the New York State
Board of Elections, Defendants-Appellees,
v.
Jerry WILLIAMS; Michael R. Long, Chairman, Conservative
Party of the State of New York,
Intervenors-Defendants-Appellants.
 No. 1144, Docket 94-9088.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 1, 1994.
Decided Nov. 2, 1994.
Opinion Issued Dec. 27, 1994.
 
 Robert L. Schulz, pro se plaintiff-appellee.
 Dorothy-Louise H. Brokaw, pro se plaintiff-appellee.
 William Van Allen, pro se plaintiff-appellee.
 Lloyd Wright, pro se plaintiff-appellee.
 Lewis B. Oliver, Oliver & Oliver, Albany, NY, for Libertarian Party of New York, plaintiff-appellee.
 Peter S. Kosinski, New York State Board of Elections, Albany, NY, for Carol Berman, Owen T. Smith, Evelyn J. Aquila, Helena M. Donahue, individually and in their capacities as Commissioners of the New York State Board of Elections, defendants-appellees.
 John F. O'Mara, Davidson & O'Mara, Elmira, NY, for Michael R. Long, Chairman of the Conservative Party of New York, intervenor-defendant-appellant.
 David L. Gruenberg, Troy, NY, for Jerry Williams, intervenor-defendant-appellant.
 Before: MINER, McLAUGHLIN, and CABRANES, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 This appeal from a judgment of the United States District Court for the Northern District of New York (Con. G. Cholakis, Judge ) concerns the constitutionality of two provisions of New York State's Election Law: N.Y.Elec.Law Sec. 5-602 and Sec. 6-140 (McKinney's 1978 & Supp.1995). Section 5-602 requires that two copies of the lists of registered voters published by county boards of elections be sent to the county chairman of each political "party." Under N.Y.Elec.Law Sec. 1-104(3), a "party" is a political organization whose gubernatorial candidate received at least 50,000 votes in the preceding election. The term does not include an "independent body," Sec. 1-104(12), such as the Libertarian Party, one of the plaintiffs.[1]
 
 
 2
 Section 6-140 requires that petitions for independent nominations indicate the signer's election district ("ED"), assembly district ("AD") (applicable in New York City and the towns of Nassau County) and ward ("W") (if any).
 
 
 3
 The constitutional challenge to these provisions was brought pursuant to 42 U.S.C. Sec. 1983 (1988) by the Libertarian Party, its gubernatorial candidate, and three voters, after the New York State Board of Elections ("Board") declared invalid a petition to nominate five Libertarian candidates for statewide offices. The district court declared that both provisions of the Election Law were unconstitutional and granted injunctive relief. Its injunction was appealed to this court on an expedited basis, about one week before the November 1994 election. We affirmed on November 2, 1994, but because of the time constraints, did not then issue an opinion.
 
 BACKGROUND
 
 4
 The procedural history of this accelerated litigation is complex and has not yet been fully recounted. We do so here.
 
 
 5
 On August 23, 1994, an independent nominating petition purporting to contain 17,234 signatures was filed with the New York State Board of Elections on behalf of five Libertarian candidates for statewide office. Under N.Y.Elec.L. Sec. 6-142, 15,000 valid signatures are required for a candidate's name to be placed on the ballot. The petition was presumptively valid until it was challenged by Jerry Williams, a registered voter, as permitted by section 6-154.[2] On September 12, 1994, eleven days after Williams filed specifications to his objections to the petition, the Board determined that the petition had only 10,305 valid signatures and was invalid. Among the reasons for its conclusion were that 1,028 signatures contained the wrong election district, 204 contained no election district, 20 contained no assembly district, and 9 contained the wrong assembly district. The number was also reduced on grounds that the original total overstated the number of actual signatures.
 
 
 6
 Immediately thereafter, the five Libertarian Party candidates sought an order in the New York Supreme Court, Albany County, declaring their nominating petition valid. They argued only that the Board lacked jurisdiction to hear Williams' challenge because of a defect in the service of the specifications to his objections. An order to show cause in that proceeding entered on September 13, 1994, setting a date of September 23, 1994, for a hearing on whether the court should enter an order declaring the independent nominating petition of the Libertarian Party sufficient and valid.
 
 
 7
 On September 16, 1994, Robert L. Schulz, the Libertarian candidate for governor, along with the Libertarian Party and three voters (Dorothy-Louise H. Brokaw, William Van Allen and Lloyd F. Wright), also brought the instant action in the United States District Court for the Northern District of New York.
 
 
 8
 In a ruling dated September 28, 1994, Judge Cholakis enjoined the Board from enforcing its September 12 determination, on the ground that the plaintiffs had made the showing necessary for preliminary injunctive relief. He found that the plaintiffs had demonstrated irreparable harm, a sufficiently serious question going to the merits, and a balance of hardships tipping in their favor. See Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122 (2d Cir.1994) (setting out standard for injunctive relief); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam) (same). Judge Cholakis crafted a provisional remedy whereby the plaintiffs were given three additional days to produce valid signatures to demonstrate that they had the support statutorily required by section 6-142, but he waived the requirement of the provision of the ED, AD, and W numbers for those signatures. In Judge Cholakis's view, three days represented the "lost time" that the plaintiffs had had to spend processing ED, AD, and W numbers for the original petition. The Board was then to determine the validity of any newly submitted signatures and report back to the court, which would then fashion a final remedy.
 
 
 9
 On September 29, 1994, the New York State Supreme Court dismissed the candidates' petition challenging the jurisdiction of the Board to consider the objections and denied all relief sought.
 
 
 10
 On October 5, 1994, the district court granted motions to intervene by Jerry Williams, who had submitted to the Board the objections to the petition, and by Michael Long, Chairman of the Conservative Party of the State of New York. The court granted the motions under Rule 24(b) of the Federal Rules of Civil Procedure, which provides for permissive intervention. In so doing, the court noted that the Board at that time had chosen not to appeal from the grant of preliminary injunctive relief, but that such an appeal would be possible by the intervenors under 28 U.S.C. Sec. 1292(a)(1) (1988), which provides for interlocutory appeals of injunctive orders. In the course of this ruling on the intervention motion, Judge Cholakis also "clarif[ied]" his September 28 decision as to both his legal conclusions and the three-day validation procedure set forth as a remedy.
 
 
 11
 The intervenors then appealed to this court, without the Board, from the order entering the preliminary injunction. At oral argument, Peter Kosinski, counsel for the Board, represented that the Board consisted of two members of the Democratic Party and two members of the Republican Party. He reported that two of the Board members did not support an appeal, thereby leaving the Board without the requisite majority to authorize an appeal. The New York Civil Liberties Union submitted a brief as amicus curiae in support of the plaintiffs-appellees' position.
 
 
 12
 On October 21, 1994, this court vacated the preliminary injunction and remanded on the grounds that no hearing had been held on contested evidence that might have been determinative of the application for the preliminary injunction. Schulz v. Williams, 38 F.3d 657 (2d Cir.1994).
 
 
 13
 From October 24 through October 26, Judge Cholakis held an evidentiary hearing, in which the Board participated as defendant, and on October 27, he reinstated his previous injunction. On October 28, the intervenors appealed, again without the Board. At oral argument, which was held on November 1, 1994, both parties agreed that the October 27 order, which followed a full trial on the merits, was a permanent injunction. On November 2, 1994, we affirmed in a summary order, noting that an opinion would follow. On November 8, 1994, the Libertarian candidates appeared on the ballot in the general election.
 
 DISCUSSION
 I. Standing of the Intervenors
 A.
 
 14
 At the outset, the court must address the question of its subject matter jurisdiction. Although neither the district court nor the parties raised the issue below, it is well established that federal appellate courts have "an independent obligation to examine their own jurisdiction." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990). The unusual procedural posture of this case--intervention after the grant of a preliminary injunction for purposes of appeal after the state decided not to appeal--warrants careful examination of the question of jurisdiction.
 
 
 15
 The Supreme Court has made clear that "an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III." Diamond v. Charles, 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986). In deciding whether the intervenors meet the Article III requirements, we take special note of the fact that the intervenors, but not the state, attempt to defend on appeal the constitutionality of the state's statutes. In Diamond, the Supreme Court held that a physician seeking to appeal a district court ruling that an Illinois abortion law was unconstitutional lacked standing to pursue the appeal himself, after the state had decided not to seek review. In so concluding, the court noted that the power to create a legal code was "one of the quintessential functions of a State." Id. at 65, 106 S.Ct. at 1705. The physician, the Court found, did not assert an injury in fact but was simply attempting to compel the state to enact a code in his interests. Id.
 
 
 16
 Since Diamond, various circuits have recognized situations in which a private individual has standing to defend on appeal a law or regulation even though the government has acquiesced in a district court's determination of invalidity. See, e.g., Didrickson v. U.S. Dep't of Interior, 982 F.2d 1332 (9th Cir.1992); Yniguez v. Arizona, 939 F.2d 727 (9th Cir.1991); cf. United States v. AVX Corp., 962 F.2d 108 (1st Cir.1992) (considering possibility, but ultimately rejecting standing of intervenor-plaintiff, an environmental organization, to challenge on appeal settlement entered into by federal and state governments with defendant corporations). To maintain standing, the intervenor must satisfy the well-established requisites of Article III. Didrickson, 982 F.2d at 1338.[3] We now pursue that inquiry.
 
 B.
 
 17
 To maintain standing to appeal, an intervenor must have suffered an injury in fact that is fairly traceable to the challenged action and that is likely to be redressed by the relief requested. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). To suffer a judicially cognizable "injury in fact" an intervenor must have a "direct stake in the outcome of a litigation" rather than "a mere interest in the problem." Diamond, 476 U.S. at 66-67, 106 S.Ct. at 1705 (quoting United States v. SCRAP, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)). The interest must be "a legally-protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and internal quotations omitted).
 
 
 18
 Michael Long intervened and appealed in his capacity as chairman of the Conservative Party of the State of New York, which had a candidate for governor on the 1994 ballot. In his affidavit in support of his motion to intervene, Long stated that the "improper placing of an additional party, in this case the Libertarian Party of New York, on the state-wide ballot for Governor could siphon votes from the Conservative Party line and therefore adversely affect the interests of the Conservative Party."[4]
 
 
 19
 The well-established concept of competitors' standing applies here. See Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 626 (2d Cir.1989) (finding loss of "opportunity to compete equally for votes in an election" sufficient injury for standing requirement). Had Judge Cholakis improperly afforded relief to the Libertarian Party, then the Conservative Party, a "party" under N.Y.Elec.L. Sec. 1-104, stood to suffer a concrete, particularized, actual injury--competition on the ballot from candidates that, as Long said, were able to "avoid complying with the Election Laws" and a resulting loss of votes. As Long points out, if a minority party fails to poll enough votes (50,000) in the gubernatorial election, it loses its place on the ballot. The district court's decision could have caused that injury, and this appeal could have afforded relief that would have redressed that injury. Therefore, Long, as representative of the Conservative Party, satisfies the minimum Article III requirements for standing.
 
 
 20
 We conclude that a case or controversy exists between Long and the plaintiffs that affords this court jurisdiction over this appeal. Because we reach this conclusion, we need not consider whether Williams would have standing to appeal independently. Through his status as an intervenor, which has not been challenged on appeal, Williams may " 'piggyback' " on Long's standing as an appellant. Diamond, 476 U.S. at 64, 106 S.Ct. at 1704.
 
 II. The Permanent Injunction
 
 21
 Having decided that this court has jurisdiction over this appeal, we now review the permanent injunction. In these circumstances, we review the injunction for an abuse of discretion. "Abuse of discretion can be found if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law." Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir.1993) (citing Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1038 (2d Cir.1992)).
 
 A. Claim preclusion
 
 22
 We first consider whether the district court correctly held that principles of res judicata did not bar the court from considering the plaintiffs' claims.
 
 
 23
 At issue is what preclusive effect, if any, resulted from the proceeding brought by the five Libertarian candidates in the New York State Supreme Court prior to the filing of the instant action. Under Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984), a federal court must give the same preclusive effect to a state court decision as a state would give it. Migra, then, turns our attention to New York law. Under New York law, parties are precluded from raising in a subsequent proceeding any claim they could have raised in the prior one, where all of the claims arise from the same underlying transaction. Reilly v. Reid, 45 N.Y.2d 24, 29, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978). Moreover, "a judgment in a prior action is binding not only on the parties to that action, but on those in privity with them." Green v. Santa Fe Indus., Inc., 70 N.Y.2d 244, 253, 519 N.Y.S.2d 793, 514 N.E.2d 105 (1987).
 
 
 24
 The appellants argue that res judicata bars review of the plaintiffs' claims on the grounds that Schulz could have brought these claims in the state court proceeding; that the Libertarian Party was adequately represented by its five candidates in that proceeding; and that the interests of the voters in the instant matter are de minimis.
 
 
 25
 The district court rejected these arguments. The court first concluded that the state court action, brought pursuant to N.Y.Elec.L. Sec. 16-102,[5] was not a proper forum for a facial constitutional challenge and that the plaintiffs' claims therefore could not have been brought in that action. It noted further that testimony regarding the appearance or non-appearance of Schulz and the Libertarian Party in the state action was "conflicting," that the voters did not appear in that action, and that the state court's decision was issued after the federal court's first decision.
 
 
 26
 We agree with the district court that the Libertarian Party and the voters were not barred by principles of res judicata from raising constitutional claims in this federal court action, but we disagree as to Schulz's claims. First, neither the district court nor the plaintiffs provide any authority for the plaintiffs' argument that Schulz could not have pursued his claims in the New York proceeding. To be sure, under New York's Election Law a court's jurisdiction in a summary proceeding is limited to that conferred by the election statute. Corrigan v. Board of Elections, 38 A.D.2d 825, 826, 329 N.Y.S.2d 857 (2d Dept), aff'd, 30 N.Y.2d 603, 331 N.Y.S.2d 35, 282 N.E.2d 122 (1972). N.Y.Elec.L. Sec. 16-100, however, provides: "The supreme court is vested with jurisdiction to summarily determine any question of law or fact arising as to any subject set forth in this article, which shall be construed liberally." Although this provision does not explicitly address facial constitutional challenges, New York courts have held that the state supreme court has jurisdiction in proceedings under section 330 (the predecessor to section 16-100) to review the constitutionality of election law provisions. See Friedman v. Cuomo, 39 N.Y.2d 81, 83, 382 N.Y.S.2d 961, 346 N.E.2d 799 (1976), cited with approval in Press v. County of Monroe, 50 N.Y.2d 695, 702, 431 N.Y.S.2d 394, 409 N.E.2d 870 (1980); see also Franco v. Board of Elections, 64 Misc.2d 19, 314 N.Y.S.2d 615 (Sup.Ct.) (considering facial challenge to election law provision in special proceeding under Sec. 330), aff'd, 35 A.D.2d 679, 315 N.Y.S.2d 812 (2d Dep't 1970); cf. Golkin v. Abrams, 803 F.2d 55, 56-57 (2d Cir.1986) (per curiam) (finding candidates who were parties to New York state court proceeding concerning validity of their petition precluded from raising constitutional claims in subsequent federal suit).
 
 
 27
 Since any party to the state court proceeding could have raised questions about the constitutionality of the disputed provisions, we next look at whose interests were represented in the state proceeding. We begin with the three voters. Although the district court did not specifically address whether the voters' interests were represented in the prior proceeding, we conclude that their claims are not barred by the doctrine of res judicata. It is well settled that under circumstances such as these, voters and their interests are sufficiently independent from the candidate's that the voters' claims are not barred by the candidate's prior litigation. See Tarpley v. Salerno, 803 F.2d 57, 59-60 (2d Cir.1986) (per curiam) (while finding action by candidate barred by res judicata, permitting action by plaintiffs-voters who had not appeared in state action on grounds that plaintiff-voter "stands on a different footing").
 
 
 28
 Nor is preclusion warranted on the theory that the voters' interests are de minimis, as the intervenors suggest. The intervenors rely on Unity Party v. Wallace, 707 F.2d 59 (2d Cir.1983), for the proposition that an encumbrance on voters' fundamental rights to associate politically and to vote for candidates of their choice is de minimis when voters may cast write-in ballots. Unity Party, 707 F.2d at 62. However, Unity Party is not on point. The Unity Party court was not faced with the question of whether the voters' claims were barred by res judicata. Unity Party concerned a challenge to the constitutionality of N.Y.Elec.L. Sec. 6-146, which requires candidates of independent bodies to file in a timely manner a form acknowledging their acceptance of a nomination secured by petition. When the candidate in Unity Party failed to file the necessary papers (the only candidate out of 148 to fail to do so that year), he was denied a place on the ballot. The court rightly concluded that this "flimsy wicket" of a requirement imposed only a de minimis burden on voters' rights, particularly in light of the write-in option. Unity Party, 707 F.2d at 62. The characterization concerned the burden imposed by that particular measure, not whether voters had any claim at all.
 
 
 29
 Having determined that the voters' claims are not precluded, we next consider the claims of the Libertarian Party. The district court, in deciding that these claims were not barred, found that the evidence concerning the appearance or non-appearance of the Libertarian Party was "conflicting." Inasmuch as the Libertarian Party was not a named petitioner in the state court proceeding, the court's finding, on this record, is not clearly erroneous. Moreover, while the Libertarian Party certainly had an interest in the state petition, we cannot conclude that the "interests represented by the [candidates]," were "in all respects identical to those" of the Party, or that the state litigation "was managed as [the Libertarian Party] thought it should be." Green v. Santa Fe Indus., Inc., 70 N.Y.2d at 254, 519 N.Y.S.2d 793, 514 N.E.2d 105 (citations and internal quotations omitted). The Libertarian Party's claims, therefore, are also not barred.
 
 
 30
 We do not, however, agree with the district court's conclusion that Schulz's claims were not barred under principles of res judicata. It is well established under both New York and federal law that a party to an action who had the opportunity to raise a claim, but failed to do so, is barred from raising that claim in a subsequent action. Reilly v. Reid, supra; cf. Allen v. McCurry, 449 U.S. 90, 104, 101 S.Ct. 411, 419, 66 L.Ed.2d 308 (1980) (asking whether party had "full and fair opportunity to litigate" federal claims in state court). The district court found that the testimony as to Schulz's "appearance or non-appearance" was "conflicting." While representing to the district court that he had been aware of the state suit when it was brought, Schulz said: "It was not my understanding that [the lawyer] was going to name me as a plaintiff in that case." Schulz said further that he appeared in court for the state proceeding because he was "curious" about it.
 
 
 31
 The facts stated by Schulz may well be true, but they do not detract from the more important, undisputed facts that Schulz was named in the state pleadings as a plaintiff, was in court on the day of the state proceeding, and has made no claim that the attorney who appeared on his behalf in the matter did so by virtue of fraud or misrepresentation. Because he was party to an action in which he could have brought his constitutional claims, Schulz's claims were barred by res judicata in the instant action.[6]
 
 
 32
 We therefore affirm the district court's conclusion that the claims of the voters and the Libertarian Party are not barred by res judicata. However, we reverse the district court's conclusion with regard to Schulz, and we find that he was precluded from raising constitutional claims in this action. This holding, however, does not bear on the remainder of this opinion, as none of the claims was brought solely by Schulz, nor was the relief granted particular to him.
 
 B. Section 6-140
 
 33
 We now turn to the merits. We first consider the plaintiffs' contention that N.Y.Elec.L. Sec. 6-140 is unconstitutional. As described above, this statute requires that an independent nominating petition indicate each signer's election district and, when appropriate, assembly district or ward. The plaintiffs claim and the district court agreed that this restriction places an unconstitutional burden on the plaintiffs' First and Fourteenth Amendment rights to associate and to have candidates of their choice placed on the ballot. See Burdick v. Takushi, --- U.S. ----, ----, 112 S.Ct. 2059, 2064, 119 L.Ed.2d 245 (1992).
 
 
 34
 The Supreme Court has recently made clear that while voting enjoys constitutional protection, every law that imposes a burden on the right to vote need not be subject to strict scrutiny. Those regulations that impose "severe" restrictions "must be narrowly drawn to advance a state interest of compelling importance." Burdick, --- U.S. at ----, 112 S.Ct. at 2063 (quoting Norman v. Reed, 502 U.S. 279, ----, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992) (internal quotations omitted)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' ... 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Burdick, --- U.S. at ---- - ----, 112 S.Ct. at 2063-64 (quoting Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983); see also LaRouche v. Kezer, 990 F.2d 36, 39-40 (2d Cir.1993).
 
 
 35
 To determine the "rigorousness of our inquiry," Burdick, --- U.S. at ----, 112 S.Ct. at 2063, we must evaluate the weight of the burden imposed by the challenged requirement. To do so, we proceed by the "totality approach" and consider the alleged burden imposed by the challenged provision in light of the state's overall election scheme. LaRouche, 990 F.2d at 39. We look further to how independent bodies have fared in the past in their attempts to gain ballot access in New York. Storer v. Brown, 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974). We also consider precedent in which courts have evaluated whether comparable voting regulations imposed an unconstitutional burden. And we of course review the evidence presented.
 
 1. Assessing the burden
 
 36
 New York's election system is largely organized at the local level. Elections are conducted not by the state Board but by local boards organized at the county level, and in New York City at the city level. The county boards are required by statute to maintain registration poll records, organized by election districts within the county, which indicate the registered voters in each district. N.Y.Elec.L. Secs. 5-600, 5-602. There was testimony that there are more than 5,600 election districts in New York State.
 
 
 37
 A candidate for statewide office representing a party--a political organization polling 50,000 votes in the prior election--need not collect signatures in support of his or her candidacy. See N.Y.Elec.L. Sec. 6-104. However, an independent who seeks a place on the ballot for statewide office must gather the signatures of 15,000 registered voters, and the petition must indicate each voter's election district, and, where applicable, assembly district and ward. Signatures may be gathered during a 42-day period which, in 1994, extended from July 12 to August 23.
 
 
 38
 A petition filed by an independent body enjoys presumptive validity. N.Y.Elec.L. Sec. 6-154. That is, if no objections to the petition are raised, the candidate will be placed on the ballot. However, any voter is permitted to present objections to the petition under section 6-154. ED, AD and W numbers may be used by both objectors and the board (in statewide elections as in the instant case, the state Board) to verify signatures.
 
 
 39
 Past history suggests that the burden imposed by the ED, AD and W requirement in this scheme does not "unreasonably interfere with the right of voters to associate and have candidates of their choice placed on the ballot." Burdick, --- U.S. at ----, 112 S.Ct. at 2064. According to undisputed figures presented by the Board members and the intervenors, three other independent parties gained access to the ballot by petition in 1994. In 1993, three did so, and in 1992 five did so--with the Libertarian Party gaining access in both years. Preceding years indicate similar success rates.
 
 
 40
 The plaintiffs argue that such figures are misleading, because most petitions proceed unchallenged. They represented at oral argument that 24 petitions had been filed by independent bodies since 1982, and the only one challenged had failed to survive.
 
 
 41
 We cannot, however, look to the only challenged petition as our guide. The fact that independent petitions enjoy presumptive validity is not a reason to turn our attention away from successful petitions, as plaintiffs suggest. To the contrary, presumptive validity is a relevant fact in the totality of the scheme. Past history indicates that the advantages of presumptive validity have made the ballot largely accessible to third-party contenders in New York. As evidenced by the myriad of independent bodies that have held a place on New York's ballot--the Libertarian, Communist, Socialist Workers, National Law, New Alliance, Workers World, Independent Progressive Line, Unity, and "No Party"--the challenged burden is not a hefty impediment to ballot access.
 
 
 42
 We next evaluate the ED, AD, and W requirement in light of precedent. At the outset, we note that the New York legislature in 1992 reduced the number of signatures required for independents from 20,000 to 15,000. N.Y.Elec.L. Sec. 6-142. According to the record, there were more than 8,700,000 registered voters in New York as of April 1994. Therefore, 15,000 represents less than one percent of the registered voters. In Storer v. Brown, supra, the Supreme Court upheld a California requirement that petitioners gather in 24 days 325,000 signatures--representing five percent of the total votes in the preceding election. 415 U.S. at 739, 94 S.Ct. at 1283. In American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the Supreme Court upheld Texas's requirement of signatures of one percent of the gubernatorial vote of the preceding election--in that case, 22,000--within 55 days. Id. at 778, 94 S.Ct. at 1304. And as the intervenors point out, if all of the time that plaintiffs allege was needed to process ED, AD, and W numbers was instead spent gathering signatures, then the plaintiffs could have gathered 45,000 signatures. The plaintiffs themselves state that they would need 30,000 signatures to provide a "safe margin" against challenges. Yet, these figures still represent half of one percent or less of the registered voters of New York. The burden of demonstrating this modicum of support falls well within the constitutional bounds set by Storer.
 
 
 43
 The district court concluded that the burden imposed by the ED, AD, and W requirement was severe. Because of other aspects of New York's electoral scheme (a low signature requirement and the presumptive validity of petitions), the high success rate of independent hopefuls in securing ballot access, and the Supreme Court's upholding of higher burdens, we disagree. We recognize the plaintiffs' evidence that vote canvassers spent 50% to 70% of their time processing these numbers; but that fact alone does not make the burden "severe." As the Supreme Court has said, "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." American Party of Texas, 415 U.S. at 787, 94 S.Ct. at 1309. The question is whether the restriction "unreasonably interfere[s]" with the effort to place a candidate on the ballot. Burdick, --- U.S. at ----, 112 S.Ct. at 2064. We conclude that the requirement of providing ED, AD, and W numbers places only a slight burden upon the plaintiffs' rights.
 
 2. Assessing the state's interest
 
 44
 Having concluded that the burden imposed is not severe, it follows that we do not apply strict scrutiny to the statutory requirement. Rather, we need to evaluate only whether the requirement is justified by a "legitimate interest" and is a "reasonable way of accomplishing this goal." Burdick, --- U.S. at ----, 112 S.Ct. at 2067.
 
 
 45
 The justification put forth in support of the provision is the state's interest in limiting the ballot to those candidates who have demonstrated support, and its interest in assuring that the support demonstrated is bona fide and is not the product of fraud or misrepresentation. Organization by election district provides a swift and efficient method of confirming voter registration, defenders of the provision contend. Cf. Rutter v. Coveney, 38 N.Y.2d 993, 994, 384 N.Y.S.2d 437, 348 N.E.2d 913 (1976) (stating that ED, AD requirements are "designed to facilitate the discovery of irregularities or fraud" in petitions).
 
 
 46
 These interests are by no means novel and have long enjoyed support in the case law. The requirement that a candidate make a preliminary showing of substantial support helps to prevent "a ballot that is complex and confusing but does not enhance the democratic nature of our political processes." LaRouche, 990 F.2d at 39 (citing Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971)). The state is further entitled to take steps to ensure that elections are "fair and honest." Burdick, --- U.S. at ----, 112 S.Ct. at 2063 (quoting Storer, 415 U.S. at 730, 94 S.Ct. at 1279).
 
 
 47
 The Supreme Court in Anderson stated that we must "pass[ ] judgment" on the "legitimacy and strength" of the state's proffered interests. 460 U.S. at 789, 103 S.Ct. at 1570. The plaintiffs have contended that section 6-140, as well as section 5-602, represents a "deliberate design" by the principal political parties to prevent independent bodies from gaining access to the ballot. Yet, they provide no evidence to support this claim. And if it were true, then the asserted culprits have not had much success: As the plaintiffs represented, 23 of the last 24 petitions resulted in independent bodies gaining access to the ballot. Thus, the restriction aims to achieve a legitimate state interest.
 
 3. Assessing the means employed
 
 48
 Having decided that the ED, AD, and W requirement is not severe, and that it is justified by a legitimate state goal, we now must consider whether the requirement is a reasonable means of achieving that goal.
 
 
 49
 The district court did not focus on whether the ED, AD, and W requirement was a "reasonable" electoral device, but instead considered whether it was "necessary" to the state's goal of petition verification. Having found, contrary to our conclusion, that the burden imposed was severe, Judge Cholakis applied strict scrutiny. In so doing, he distinguished the instant case from Burdick, in which the burden was deemed "limited" and strict scrutiny therefore not warranted. --- U.S. at ---- - ----, 112 S.Ct. at 2063-65. Judge Cholakis instead relied on Anderson v. Celebrezze, which stated that a court should consider "the extent to which [the state's] interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789, 103 S.Ct. at 1570.
 
 
 50
 Burdick cites Anderson with approval, and in fact adopts the Anderson test. But Burdick and its progeny make clear that not every law that "imposes any burden upon the right to vote must be subject to strict scrutiny." --- U.S. at ---- - ----, 112 S.Ct. at 2062-63; see Hagelin for President Comm. of Kans. v. Graves, 25 F.3d 956, 961 (10th Cir.1994) (not requiring state to make "particularized showing of a need" for ballot access laws, but only to establish that they represent "reasonable response to the state's interest"), cert. denied, --- U.S. ----, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995); Libertarian Party of Me. v. Diamond, 992 F.2d 365, 373 (1st Cir.) (holding ballot access requirements "neither inappropriate to their purposes nor unconstitutionally burdensome"), cert. denied, --- U.S. ----, 114 S.Ct. 310, 126 L.Ed.2d 257 (1993).[7]
 
 
 51
 The important lesson of Anderson that Burdick reiterates is that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Burdick, --- U.S. at ----, 112 S.Ct. at 2063. Because we have concluded that the burden imposed by the requirement is slight, we need only consider whether the requirement is a reasonable means of achieving the state's legitimate goals.[8]
 
 
 52
 This question of the constitutionality of the ED, AD, and W requirement was considered in Berger v. Acito, 457 F.Supp. 296 (S.D.N.Y.1978), and the court there found that the requirement was constitutional, saying it "is within the legislative province to provide for the publication and use of the registration information in a particular fashion."[9] Id. at 300. What potentially changes the calculus since that 1978 decision is the advent and accessibility of advanced computer technology.
 
 
 53
 Although the facts in this case appeared to be hotly contested on this question, the relevant facts--as culled from the record, oral argument, and the district court opinions--actually do not appear to be in dispute. There was abundant testimony that for relatively small sums of money--by one account, $12,000, by others, less--the State Board of Elections could gain the computer capacity that would make verification of signatures by books organized by election district numbers obsolete.
 
 
 54
 At the same time, however, neither the plaintiffs, their witnesses, nor the district court contends that the state has that capacity at this time. One of the plaintiffs' witnesses who worked for the state Board testified that the storage capacity of the Board's computer equipment was not adequate for the state's entire voter database. Another, who also worked for the Board, said, "I need to analyze this system in a form outside of this court to tell you what the storage requirements are for voter registration stored on the State Board of Elections computer.... [T]hat's something we haven't done yet and need to do." The witness acknowledged that the Board currently lacked the capacity to store a list of the state's registered voters in alphabetical form but could get that capacity if it purchased the proper software and hardware. Finally, one of the plaintiff's witnesses who gathered votes and, as well, reviewed the Board's computer capacity, testified that the Board's equipment as it currently exists could store information about the state's nearly nine million registered voters, but other files would have to be removed, and it would create "headaches" for the computer technicians.
 
 
 55
 In analyzing the constitutionality of the requirement at issue, we are not to determine how the State of New York should verify voter signatures in the best of all worlds--a world in which it had the funds to create a statewide computer system that was capable of checking the registration status of nine million voters. Rather, we must consider whether the means employed are reasonable. Burdick, --- U.S. at ----, 112 S.Ct. at 2067. We cannot conclude that the burden imposed upon voters by the system as it now exists constitutionally requires the State of New York to expend both the money and human and other resources to alleviate that burden.[10]
 
 
 56
 In sum, we conclude that the district court erred in holding that the burden imposed by the ED, AD, and W requirement is severe. Because the level of scrutiny to be applied to the restriction follows from that determination, we hold further that the district court erred in applying strict scrutiny. Applying the rational basis test, we conclude that the provision is constitutional.
 
 C. Section 5-602
 
 57
 The plaintiffs allege that N Y.Elec.L. Sec. 5-602 violates their rights under the Equal Protection Clause of the Fourteenth Amendment because it discriminates against independent bodies in favor of parties.[11] See Bullock v. Carter, 405 U.S. 134, 140-44, 92 S.Ct. 849, 854-56, 31 L.Ed.2d 92 (1972) (applying the "fundamental rights" strand of equal protection analysis to restrictions that affect First and Fourteenth Amendment rights of voters). The statute requires local boards of election to supply, free of charge and absent specific request, two copies of lists of registered voters to, among others, the county chairmen of political parties.
 
 
 58
 This provision does not warrant lengthy analysis because the Supreme Court has already considered this question. The predecessor to section 5-602, section 376(5) of the Election Law of 1949 (as amended), was held unconstitutional in Socialist Workers Party v. Rockefeller, 314 F.Supp. 984, 997 (S.D.N.Y.) (three-judge court), summarily aff'd, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970).
 
 
 59
 The Supreme Court has said that "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions." Anderson, 460 U.S. at 784 n. 5, 103 S.Ct. at 1568 n. 5 (internal quotations omitted). But the precise issue presented here was indeed decided in Socialist Workers Party. Despite that ruling, the New York legislature reenacted the provision considered in that case in all material, unlawful respects, but simply under a different number, when it recodified the Election Law in 1976.
 
 
 60
 The reasons why the courts found the provision invalid in 1970 remain true today and apparently require repeating:
 
 
 61
 It is clear that the effect of these provisions ... is to deny independent or minority parties ... an equal opportunity to win the votes of the electorate. The State has shown no compelling state interest nor even a justifiable purpose for granting what, in effect, is a significant subsidy only to those parties which have least need therefor....
 
 
 62
 ... The State is not required to provide such lists free of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them.
 
 
 63
 Socialist Workers Party, 314 F.Supp. at 995-96.
 
 
 64
 The typical remedy afforded when a statute is found to be facially unconstitutional is an injunction enjoining its enforcement. In this case, however, that relief would not have remedied the harm already worked--voter lists that could have aided the plaintiffs in their petitioning effort were not made available to them but were provided to their adversaries. Those parties could use the lists in their efforts to place their candidates already on a party line on an additional independent line, and to wage a swift and effective attack on the Libertarian petition.[12]
 
 
 65
 Although Judge Cholakis designed the specifics of his preliminary relief around the purported "lost time" attributable to the gathering of ED, AD and W numbers, the preliminary and permanent injunctions were based on the unconstitutional burdens created by both provisions. Under the particular circumstances presented here, it was not an abuse of discretion to afford this relief on the basis of the facial unconstitutionality of section 5-602. Cf. McCarthy v. Briscoe, 429 U.S. 1317, 1322, 97 S.Ct. 10, 13, 50 L.Ed.2d 49 (1976) (in fashioning remedy in response to state's unconstitutional election law, "a court may properly look to available evidence or to matters subject to judicial notice to determine whether there is reason to assume the requisite community support").[13]
 
 Conclusion
 
 66
 In sum, we affirm the district court's declaratory judgment that N.Y.Elec.L. Sec. 5-602 is unconstitutional. The district court, however, erred in declaring section 6-140 unconstitutional. Nevertheless, we hold that the district court's entry of a permanent injunction was not an abuse of discretion, as it represented appropriate relief for the plaintiffs based on the harm worked by the discriminatory aspects of section 5-602. On that basis, we affirm the permanent injunction.
 
 
 
 [1]
 Several terms that regularly appear in this opinion are defined by the New York Election Law
 Section 1-104(3) defines "party" as "any political organization which at the last preceding election for governor polled at least fifty thousand votes for its candidate for governor."
 Section 1-104(12) defines "independent body" as "any organization or group of voters which nominates a candidate or candidates for office to be voted for at an election, and which is not a party as herein provided."
 Section 1-104(11) defines "nomination" as "the selection in accordance with the provisions of [the Election Law] of a candidate for an office authorized to be filled at an election."
 Section 1-104(13) defines "independent nomination" as "nomination by an independent body."
 
 
 [2]
 Section 6-154 provides, in pertinent part:
 
 
 [1]
 Any petition filed with the officer or board charged with the duty of receiving it shall be presumptively valid if it is in proper form and appears to bear the requisite number of signatures, authenticated in a manner prescribed by this chapter
 
 
 [2]
 Written objections to any ... nominating ... petition ... may be filed by any voter registered to vote for such public office.... When such an objection is filed, specifications of the grounds of the objections shall be filed within six days thereafter with the same officer or board.... Each such officer or board is hereby empowered to make rules in reference to the filing and disposition of such petition, certificate, objections and specifications
 
 
 [3]
 The fact that the appellants were granted intervenor status is not dispositive of their standing to appeal. As the Court of Appeals for the Ninth Circuit has noted, "An interest strong enough to permit intervention is not necessarily a sufficient basis to pursue an appeal abandoned by the other parties." Didrickson, 982 F.2d at 1338
 
 
 [4]
 We look to Long's affidavit in support of his motion to intervene as a second-best source for our standing inquiry. Had the parties or the district court raised the issue of standing below, then the intervenors might have submitted affidavits specifically to meet their burden of establishing the elements of standing. See Lujan v. Defenders of Wildlife, --- U.S. at ---- - ----, 112 S.Ct. at 2136-37. In the absence of such documents at this stage, we look first at the evidence presented at trial. See id. (burden of proof on question of standing corresponds to stage of litigation). Because the intervenors, however, did not present any of their own evidence but relied on cross examination at trial, we turn instead to the affidavits in support of their motions to intervene. See Warth v. Seldin, 422 U.S. 490, 501-02, 95 S.Ct. 2197, 2206-07, 45 L.Ed.2d 343 (1975) (court may review all materials in record to assess standing, including affidavits in support of standing). In so doing, we note that the portions on which we rely do not appear to be contradicted or undermined by other evidence in the record
 
 
 [5]
 Section 16-102 provides, in pertinent part:
 [A]ny independent nomination ... may be contested in a proceeding instituted in the supreme court by any aggrieved candidate....
 
 
 [6]
 In support of its decision that the plaintiffs' claims were not barred, the district court also noted that its order of preliminary injunction preceded--by one day--the state court's decision, and that the latter judgment therefore did not bar the former order. This argument does not help the plaintiffs because the district court's first order was a preliminary injunction, tentative by nature and in fact subsequently vacated. It was not a final judgment for purposes of res judicata. See Goodheart Clothing Co. v. Laura Goodman Enters., 962 F.2d 268, 273-74 (2d Cir.1992)
 
 
 [7]
 Because strict scrutiny is not warranted in this case, the case is distinguishable from Pilcher v. Rains, 853 F.2d 334 (5th Cir.1988), on which the plaintiffs rely
 
 
 [8]
 The per curiam opinion that vacated the district court's initial entry of a preliminary injunction by no means required the district court to apply strict scrutiny. The scope of that opinion was limited to the fact that the district court had not yet conducted an evidentiary hearing on contested evidence that might have been determinative of the application for a preliminary injunction. The per curiam opinion's citation to Anderson simply referred to the analysis that the district court articulated. At that stage it did not review it
 
 
 [9]
 The Berger court specifically considered the constitutionality of N.Y.Elec.L. Sec. 6-132, which applies the same ED, AD, and W requirement to candidates' "designating petitions" for primary elections
 
 
 [10]
 We by no means intend to suggest that adaptation of computer technology in this area is inadvisable or unwarranted--only that under these circumstances it is not constitutionally required. We recognize that the political branches of the New York government are taking steps toward increased computerization of the electoral process. Testimony indicated, for example, that the State Board of Elections' 1993 report to the Legislature contained a recommendation by the Board's database programmer analyst that the Board replace its computer system and initiate a pilot program to automate petition checking. Moreover, a 1982 regulation permits the counties to switch their central file registration records--compilations of voter lists from all election districts--onto a computerized format. N.Y.Comp.Codes R. & Reg. tit. 9 Sec. 6207.1
 
 
 [11]
 Section 5-602 provides in relevant part:
 The board of elections shall prepare at least fifty copies of such pamphlet and shall send at least one copy of each such list to the state board of elections, at least two copies to the county chairman of each political party, and shall keep at least five copies for public inspection at each main office or branch of the board. Other copies shall be sold at a charge not exceeding the cost of publication.
 The plaintiffs' complaint specifically requests a declaratory judgment that section 5-602 is invalid, but it does not request the same for section 5-604. Section 5-604 requires that enrollment lists indicating the party enrollment of registered voters be sent to the chairmen of the state committee of each political party and to the county chairmen of each party, normally in April of each year.
 Though the plaintiffs' complaint and memorandum of law speak of the harm caused by both provisions, and though Judge Cholakis stated that the reasoning he employed with respect to section 5-602 applied to section 5-604, he did not rest the grant of preliminary relief on that provision. Though we see no reason why the patent constitutional infirmity of section 5-602 would not apply to section 5-604, we decline to review the constitutionality of a provision not specifically considered by the district court.
 
 
 [12]
 The intervenors contend that the plaintiffs were not harmed because the lists that they were seeking are published and distributed after the petitioning period. However, the harm stemmed from the availability, and lack thereof, of the most recent lists published and distributed to party chairmen before the 1994 election
 
 
 [13]
 The Board members, in their memorandum of law before the district court, raised the issue that the Board was not charged with administering section 5-602. Rather, the county boards provide information under that statute. While the individual county board members might have been proper parties to this action, the state Board's members also were proper parties. "It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act." Donohue v. Board of Elections of N.Y., 435 F.Supp. 957, 963 (E.D.N.Y.1976). Under New York law, the state Board has "jurisdiction of, and [is] responsible for, the execution and enforcement of ... statutes governing campaigns, elections and related procedures." N.Y.Elec.L. Sec. 3-104. The state Board's members therefore have the requisite "special relation" to the contested provision to render them proper defendants. Ex parte Young, 209 U.S. 123, 157, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)