

# SUPREME COURT OF MISSOURI
# en banc

GERALD GEIER AND STOP NOW!,     )
    )
        Appellants,     )
    )
v.     )     No. SC94951
    )
MISSOURI ETHICS COMMISSION, ET AL.,     )
    )
        Respondents.     )
    )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
**The Honorable Joel P. Fahnestock, Judge**

*Opinion issued November 24, 2015*

Gerald Geier and the political action committee of which he was the treasurer, Stop Now!, both appeal from the circuit court's grant of summary judgment in favor of the Missouri Ethics Commission in an action involving their challenge to the constitutional validity of sections 130.021.4(1), 130.021.7, and 130.021.8, RSMo Supp. 2009, as well as sections 130.046.1, RSMo Supp. 2007, and 105.961.3, RSMo 2000. This Court affirms the judgment.

## I. Factual and Procedural Background

From 1991 to 2012, Gerald Geier, a certified public accountant, was the treasurer of Stop Now!, a Missouri political action committee (PAC) that engaged in issue

advocacy opposing ballot initiatives that would raise taxes. He was required to register the PAC with the Missouri Ethics Commission (MEC), the agency responsible for administering Missouri's campaign finance disclosure laws. Geier completed a "Statement of Committee Organization" form, which named him as the treasurer and required him to identify the PAC's bank account. Stop Now! became inactive after 2003. The bank closed the account in 2006 after routine fees depleted the account to zero. Stop Now! did not notify the MEC of the account's closure as required by section 130.021.7, RSMo Supp. 2009.

Stop Now!, however, remained a registered PAC and, from 2004 to 2010, continued to file the quarterly disclosure reports required by sections 130.041.1, RSMo 2000 and 130.046.1, RSMo Supp. 2007 indicating that it had no money and was engaging in no activity.[1] When Stop Now! failed to file reports for the first three quarters of 2011, the MEC opened an investigation. Geier subsequently filed the overdue reports along with a "Committee Termination Statement," indicating the dissolution of Stop Now!.

The MEC filed a formal complaint against Geier and Stop Now!, alleging they violated section 130.046.1, RSMo Supp. 2007 by failing to timely file disclosure reports in 2011 and violated sections 130.021.4(1) and 130.021.7, RSMo Supp. 2009 for failing to maintain a bank account or notify the MEC of changes to the account. The MEC held a hearing on the complaint, which was closed to the public pursuant to section 105.961.3.

---

[1] Because by this point Stop Now! was inactive, these required quarterly filing obligations could be met by filing a "Committee Statement of Limited Activity" certifying that the PAC's receipts and expenditures did not exceed $500 for the reporting period. Section 130.046.3, RSMo Supp. 2007.

RSMo 2000. It found probable cause that Geier and Stop Now! unknowingly violated the applicable statutes due to the delinquent disclosure reports and failure to timely file a termination statement after the bank account was closed. The MEC issued a letter to Geier stating that no further action would be taken.[2]

Geier appealed the MEC's probable cause determination to the Administrative Hearing Commission (AHC) on behalf of himself and Stop Now!. He admitted the statutory violations, arguing instead that the reporting statutes were unconstitutional as applied because Stop Now! had been inactive prior to commencement of the enforcement action. He also challenged the constitutional validity of section 105.961.3, RSMo 2000, the provision under which the MEC's enforcement hearing was closed to the public. Finally, Geier argued that, if violations occurred, they must be attributed to Stop Now! and not to him either personally or in his official capacity as treasurer. The AHC granted summary decision on all counts in favor of the MEC.

Geier next sought judicial review in the circuit court pursuant to section 536.110, RSMo 2000. He raised each of the claims asserted at the AHC and asserted new claims. In addition to the "as applied" constitutional challenges to the reporting statutes, he also challenged the statutes facially, seeking declaratory and injunctive relief barring

---

[2] While the MEC action was pending, Geier brought suit in federal court, arguing the enforcement action violated the First Amendment to the United States Constitution and seeking declaratory and injunctive relief. The district court abstained under the *Younger* doctrine, which states that federal courts should not exercise jurisdiction when (1) there is an ongoing state proceeding, (2) important state interests are involved, and (3) there is an adequate opportunity to raise the federal questions in the state proceeding. *Plouffe v. Ligon*, 606 F.3d 890, 892 (8th Cir. 2010). The Eighth Circuit affirmed. *See Geier v. Mo. Ethics Comm'n*, 715 F.3d 674 (8th Cir. 2013).

enforcement of the statutes against similarly situated inactive PACs. Finally, he

supplemented the constitutional challenges with claims under 42 U.S.C. §§ 1983 and

1988. The circuit court granted summary judgment in favor of the MEC. Geier appeals.[3]

## II. Standard of Review

This is an appeal from the circuit court's review of the AHC's grant of summary

decision in favor of the MEC. Typically, in an appeal from an agency-tried case this

Court reviews the decision of the agency and not the circuit court. *Garozzo v. Mo. Dep't.*

*of Ins., Fin. Inst. & Prof'l Registration, Div. of Fin.*, 389 S.W.3d 660, 663 (Mo. banc

2013). Here, however, the circuit court was the first to rule on the bulk of Geier's

constitutional claims because the AHC cannot declare a statute unconstitutional. *Cf.,*

*State Tax Comm'n v. Admin. Hearing Comm'n*, 641 S.W.2d 69, 75-76 (Mo. banc 1982).

Additionally, Geier's §§ 1983 and 1988 claims were not presented to the AHC.

Rulings were entered in favor of the MEC before both the AHC and the circuit

court. The circuit court decided only questions of law, and there were no factual

disputes. Regardless of whether this Court reviews the AHC's decision or the circuit

court's judgment, the standard of review is the same. The propriety of summary

judgment is an issue of law entitled to *de novo* review. *Floyd-Tunnell v. Shelter Mut. Ins.*

*Co.*, 439 S.W.3d 215, 217 (Mo. banc 2014). Additionally, both the constitutional validity

of a statute and an agency's interpretation and application of a statute are subject to *de*

---

[3] This Court has exclusive jurisdiction of the appeal because the case involves the constitutional validity of Missouri statutes. MO. CONST. art. V, sec. 3.

*novo* review. *State v. Young*, 362 S.W.3d 386, 390 (Mo. banc 2012); *Algonquin Golf Club v. State Tax Comm'n*, 220 S.W.3d 415, 418 (Mo. banc 2007).

### III. Analysis:

*A. The Reporting Statutes Are Constitutional As Applied*

Before turning to Geier's constitutional challenge, a review of Missouri's Campaign Finance Disclosure laws as well as First Amendment jurisprudence in the area of campaign finance regulation is helpful. Missouri's Campaign Finance Disclosure Law defines a "PAC" as

> a person or any combination of persons, who accepts contributions or makes expenditures for the primary or incidental purpose of influencing or attempting to influence the action of voters for or against the nomination or election to public office of one or more candidates or the qualification, passage or defeat of any ballot measure . . . .

Section 130.011(7), RSMo Supp. 2007. Every committee qualifying as a PAC must have a treasurer and must maintain a bank account in Missouri. Sections 130.021.1, 130.021.4(1), RSMo Supp. 2009. Each PAC must also file a statement of organization listing contact information for the treasurer, candidate and officers (if applicable), as well as the name of its bank and account number. Section 130.021.5, RSMo Supp. 2009. The statement of organization must be amended if any of the listed information changes. Section 130.021.7, RSMo Supp. 2009. The treasurer is also required to file regular disclosure reports detailing all receipts and expenditures. Section 130.041.1, RSMo 2000. Reports must be made each calendar quarter in which contributions or expenditures exceed $500. Section 130.046.3, RSMo Supp. 2007. If contributions or expenditures are less than $500, a PAC may meet its reporting obligation by filing a one-

5

page "Committee Statement of Limited Activity."  Finally, when a PAC dissolves, a termination statement must be filed no later than 10 days after the date of dissolution. Section 130.021.8, RSMo Supp. 2009.

Geier and Stop Now! do not dispute that they violated the campaign finance laws by failing to maintain a bank account after 2006, failing to amend the statement of organization after the bank account was closed, failing to file quarterly reports for the first three quarters of 2011, and failing to timely file a termination statement.  Instead, Geier argues that sections 130.021.4(1), 130.021.7, 130.021.8, RSMo Supp. 2009, and section 130.046.1, RSMo Supp. 2007 (collectively "the reporting statutes") violate the First Amendment to the United States Constitution "as applied" to Stop Now!, a PAC that had been inactive for several years prior to the MEC's enforcement action.

The First Amendment prohibits laws "abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble . . . ."  U.S. CONST. amend. I.  The United States Supreme Court has held that campaign finance regulations operate in the most fundamental of First Amendment activities because they limit expression and associational rights related to the discussion of public issues and candidates for public office.  *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).  The Supreme Court has distinguished laws that limit speech by restricting "the amount of money a person or group can spend on political communication" from disclosure regulations which, though they burden the ability to speak, "impose no ceiling on campaign-related activities."  *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339, 366 (2010).

6

Regulations that limit speech are subject to "strict scrutiny," which requires the government to prove that the regulation furthers a compelling interest and is narrowly tailored to achieve that interest. *Id.* at 340. Disclosure and reporting requirements, on the other hand, are subject to "exacting scrutiny." *Id.* at 366. "Exacting scrutiny" is a lesser standard, requiring that the government establish a "substantial relation" between the regulation and a "sufficiently important" interest. *Id.* The reporting statutes here are disclosure requirements, and exacting scrutiny applies. To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010).

*Buckley* states that disclosure and reporting requirements directly serve substantial governmental interests. 424 U.S. at 68. The *Buckley* Court explained that there are at least three categories of sufficiently important interests that can justify such regulations. *Id.* at 66-68. The first interest is informational—the need to provide the electorate with information about the sources of election-related spending. *Id.* The second is to "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.* The third interest is in the "gathering of data necessary to detect violations of [other campaign finance laws]." *Id.*[4] Geier argues

---

[4] Geier suggests that the governmental interests identified by *Buckley* may no longer be valid under more recent precedent from the Supreme Court. He cites *McCutcheon v. Federal Election Comm'n*, in which the Court recognized that there is only one legitimate governmental interest for restricting campaign finances: "preventing corruption or the appearance of corruption" and, in particular, quid pro quo corruption. 134 S. Ct. 1434, 1450 (2014). Geier argues that, because there is no risk of this type of corruption by an issue PAC, the State cannot identify a sufficiently important interest to justify the reporting statutes. His reliance on *McCutcheon* is misplaced. The statutes at issue there were campaign contribution limits, not disclosure and reporting regulations. As highlighted by the different degrees of scrutiny, the interests underlying

7

that the reporting statutes are unconstitutional as applied to himself and Stop Now!. He asserts that in the unique context of an inactive PAC – a PAC that is no longer "speaking" – the State either has no interest to justify required disclosure and reporting, or that its interest is so diminished as to be outweighed by the burden placed on First Amendment rights. He asks this Court to declare that he and Stop Now! committed no violations of Missouri law. To determine whether the reporting statutes withstand exacting scrutiny, this Court must examine the State's interests in the statutes, assess whether the statutes are substantially related to those interests, and look to the unique burden the statutes placed on Geier and Stop Now!.

It first must be noted that the governmental interests outlined in *Buckley v. Valeo* are narrower in the context of disclosure and reporting regulations when applied to an "issue PAC" as opposed to a PAC supporting or opposing a candidate for office. In the case of a ballot initiative, there is no "risk of quid pro quo corruption present when money is paid to, or for, candidates." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 203 (1999). Assuming that Stop Now! was truly an "issue PAC" speaking only about tax-related ballot initiatives,[5] the reporting statutes here must be justified by (1) the State's interest in gathering data to detect other violations of campaign finance laws and/or (2) the informational interest: "the need to provide the electorate with

---

regulations of campaign spending and regulations requiring disclosure and reporting are different. *McCutcheon* did nothing to erode the governmental interests for disclosure regulations outlined in *Buckley* and, in fact, cited them favorably. 134 S. Ct. at 1459.

[5] Geier admits that, though Stop Now! was primarily an "issue PAC," it at least once engaged in direct support of a candidate for office.

information about the sources of election-related spending." *Buckley v. Valeo*, 424 U.S. at 66-68.

Missouri's broad interests in preserving the integrity of the election process . . . are significant, compelling and important. *Weinschenk v. State*, 203 S.W.3d 201, 217 (Mo. banc 2006). The MEC serves the public interest by enforcing Missouri election law in a nonpartisan and transparent manner to provide the electorate with accountability as to the source of political speakers. The MEC has an interest in enforcing Missouri's campaign finance laws and providing the public with information and accountability about how money is spent in elections and on issue advocacy. These interests comport with *Buckley*. Geier, however, argues that even if this is true as applied to PACs generally, the State does not have a real interest in the disclosure and reporting of Stop Now!, a PAC that had been financially dormant for several years before its bank account was closed and for nearly a decade before the MEC opened its investigation.

In support of his contention that the State has insufficient interest to justify enforcing the reporting statutes against an inactive PAC, Geier primarily relies on *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012). In that case, Minnesota business entities challenged the independent expenditure and reporting provision of Minnesota's campaign finance law. *Id.* at 867-68. The provisions applied to all "associations," defined as "group[s] of two or more persons, who are not members of the same family, acting in concert." *Id.* The law required all associations to make indirect expenditures through a PAC or through an "independent expenditure political fund." *Id.* at 868. Once formed, an "independent expenditure political fund"

9

was subject to ongoing reporting requirements, and if the fund was inactive during a reporting period, it was required to file a statement of inactivity. *Id.* at 869. The Eighth Circuit held that the independent expenditure and reporting requirements were likely unconstitutional. *Id.* at 877.[6] In particular, the court noted that the ongoing reporting requirement chilled speech because it forced any association, no matter how small, to decide whether exercising its constitutional right was worth navigating the regulatory red tape. *Id.* at 873. It also found that Minnesota could accomplish its goals through less burdensome measures. *Id.* at 876-77.

On its face, *Minnesota Citizens* does not apply to this case. The Eighth Circuit specifically excluded PACs from its analysis, reversing the lower court's denial of a preliminary injunction "to the extent it requires ongoing reporting requirements from associations not otherwise qualifying as PACs under Minnesota law." *Id.* at 877. It stated that its holding did not affect Minnesota's regulation of PACs and that associations "whose major purpose is to influence the nomination or election of a candidate or to promote or defeat a ballot question would still comply with the same essential requirements because they are political committees." *Id.* at 877 n.11. Here there is no question that Stop Now! was a PAC. As such, the unconstitutional reporting requirements applying to "associations" in *Minnesota Citizens* do not similarly apply to Stop Now!, and that case does not render the reporting statutes here unconstitutional.

---

[6] Part of the problem in *Minnesota Citizens* was that the Minnesota law, which required any association to speak through a political fund, imposed virtually identical regulatory burdens on political funds as it did on PACs. 692 F.3d at 872. Under *Citizens United*, corporations cannot be forced to "speak" through a PAC. 558 U.S. at 337-38.

Apart from *Minnesota Citizens*, Geier offers no authority for the proposition that the State has no interest in receiving disclosure reports from inactive PACs. He argues that there can be no sufficiently important State interest in disclosure by a speaker potentially capable of speech, but not actually engaged in speech or other related activity by way of accepting contributions or making expenditures. Stop Now!'s inactivity, however, does not alter the State's interest in enforcing the reporting statutes, and Geier's contention that a PAC cannot be required to file a report if it has not accepted contributions or made expenditures misunderstands those interests. The State's interests in providing information and accountability to the public, as well as enforcing Missouri's campaign finance laws, would be frustrated if a PAC could file nothing with respect to its activities during a reporting period. Otherwise, the MEC would be forced to continually sift through each PAC that did not file disclosure reports to determine which were shirking their disclosure obligations and which were merely inactive. The MEC had no way of knowing, absent a termination statement, that Stop Now! had effectively dissolved. Stop Now! remained a registered Missouri PAC, capable of becoming active and "speaking" again at any time. Stop Now!'s inactivity did not diminish the State's interest in disclosure and reporting.

Having found that the State's interests in the reporting statutes are sufficiently important, even in the case of an inactive PAC, this Court turns to the reporting statutes and finds they are substantially related to those interests. Section 130.046.1, RSMo Supp. 2007 requires PACs to file quarterly reports disclosing contributions and expenditures, which the MEC is responsible for reviewing and, if necessary, conducting

11

an audit or investigation. Section 105.959.1, RSMo Supp. 2007. Tracking funds distributed among multiple accounts and banks would be time-consuming and costly. Sections 130.021.4 and 130.021.7, RSMo Supp. 2009, which require PACs to maintain a single account in Missouri and notify the MEC of any changes, allow the MEC to efficiently investigate violations of the campaign finance disclosure laws. For similar reasons, section 130.021.8, RSMo Supp. 2009, which requires PACs to timely file a termination statement after dissolution, is substantially related to the State's interests because it requires PACs to notify the MEC that they no longer exist and provide the MEC with the information about the disposition of remaining funds and debts it needs to perform a final audit. In other words, the statutes serve the State's interests by allowing it to track where the money is being spent – or, in Stop Now!'s case – where it was spent.

Finally, the Court turns to the burden placed on Geier and Stop Now!'s First Amendment rights by the reporting statutes. Geier argues that the statutes imposed "overly burdensome reporting requirements," both in determining what is required under the statutes and in making the required disclosures. The record, however, does not indicate that Geier did not understand the requirements of Missouri's campaign finance disclosure laws. On the contrary, he complied with the quarterly reporting requirements for nearly two decades. There is no evidence in the record that, during that period, he ever complained that the obligation was too burdensome. Rather, Geier stated that the reporting stopped, not because of any burden, but because "life goes on, people have things to do, and no activity occurred."

12

The relevant reporting and disclosure requirements were not overly burdensome. The "Committee Statement of Limited Activity," which satisfies a PAC's reporting requirement under section 130.046.1, RSMo Supp. 2007 for quarters where contributions or expenditures are less than $500, is a one-page form requiring limited information and may be filed electronically. Similarly, sections 130.021.4(1) and 130.021.7, RSMo Supp. 2009, which required Stop Now! to maintain a Missouri bank account and amend its statement of organization of any changes to that account, are not overly burdensome. The statement of organization is a one-page document and the record reflects that, prior to the MEC's enforcement action, Geier completed both Stop Now!'s initial statement of organization and an amended statement. Finally, Stop Now! was not overly burdened by the requirement of section 130.021.8, RSMo Supp. 2009 that a termination statement be timely filed upon a PAC's dissolution. The termination statement requires a final accounting of the PAC's finances and contact information for the person responsible for its records. This merely required Geier to provide information he was already required by law to keep. Furthermore, the termination statement would have relieved Geier of the ongoing reporting requirements of which he now complains.

In sum, the reporting statutes are substantially related to the State's sufficiently important informational, accountability, and enforcement interests. They "impose no ceiling on campaign-related activities" and "do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366. Further, they imposed no more than a minimal burden on Geier and Stop Now!'s First Amendment rights. On balance, the statutes meet exacting scrutiny, and judgment was proper in favor of the MEC.

13

*B. Geier's Facial Challenges Are Not Ripe*

Geier not only challenges the reporting statutes as applied to him and Stop Now!, but also challenges them facially, seeking declaratory and injunctive relief preventing enforcement of the statutes against any hypothetical similarly dormant PACs or their treasurers. The MEC contends that his claim triggers justiciability concerns. A justiciable controversy requires standing and ripeness. *Schweich v. Nixon*, 408 S.W.3d 769, 773-74 (Mo. banc 2013). To have standing, a party must have a personal stake arising from a threatened or actual injury. *Id.* at 774. Even when a party has standing, however, the claims must also be ripe, which requires the dispute to be "developed sufficiently to allow the court to make an accurate determination of the facts, to resolve a conflict that is presently existing, and to grant specific relief . . . ." *Id.* A claim is not ripe for adjudication if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

Standing and ripeness, often closely related, are both implicated here because Geier seeks relief on behalf of others not before this Court and in future circumstances not certain to occur. However, he offers no evidence of any such similarly situated PAC. He also has not pointed to any future plans of his own to become treasurer of a PAC that becomes inactive after many years without formally dissolving. Geier argues that in the First Amendment context, standing and ripeness requirements are relaxed because of the potential "chilling" effect on speech—a judicial assumption that a statute's very existence

14

may cause others not before the court to refrain from constitutionally protected speech or expression. *State v. Vaughn*, 366 S.W.3d 513, 518 (Mo. banc 2012).

Geier contends there is a sufficient record of chilling in this case to establish standing and ripeness. He asserts that enforcement of the reporting statutes has chilled his own political speech in that he fears engaging in future speech potentially subject to the MEC's regulation because "it may be too expensive and burdensome for me to bear." He argues that the regulatory burden will prevent him from serving in the future as treasurer of a PAC. He also states that Stop Now! "terminated itself out of existence rather than remain merely dormant because of the chilling effect of the enforcement action itself." Geier's assertions of chilling, though possibly relevant to standing if credited, do not address the ripeness of a pre-enforcement challenge to the reporting statutes on behalf of either hypothetically inactive PACs or Geier himself as a future PAC treasurer. This Court holds such claims for declaratory and injunctive relief are not ripe for review. Judgment was proper on behalf of the MEC.

*C. Section 105.961.3 Does Not Violate the First Or Sixth Amendments*

Geier next argues that section 105.961.3, RSMo 2000, the statute that requires the MEC's hearings be closed to the public, violates the First and Sixth Amendments to the United States Constitution both facially and as applied. He contends that the hearing, which was closed over his objection, violated his and Stop Now!'s rights, as well as the rights of the public and the news media. He seeks declaratory and injunctive relief barring all closed door hearings under section 105.961.3, RSMo 2000. To address this claim, it is necessary to review what actually occurred before the MEC in this case.

15

The MEC is an administrative body established to administer and enforce ethics-related laws, including the campaign finance disclosure provisions. *Impey v. Mo. Ethics Comm'n*, 442 S.W.3d 42, 44 (Mo. banc 2014). The MEC is authorized to receive complaints alleging violations of any of the campaign finance disclosure laws. Section 105.957.1(3), RSMo Supp. 2007. The MEC here, after investigation into Stop Now!, determined that there were reasonable grounds to believe that non-criminal violations of the campaign finance disclosure laws had occurred. Because the suspected violations were non-criminal, the MEC conducted a hearing which, pursuant to section 105.961.3, RSMo 2000, "*shall* be a closed meeting and not open to the public." (emphasis added). After the closed hearing, the MEC determined there was *probable cause* that a violation had indeed occurred. Subsequently and pursuant to section 105.961.4(5), RSMo 2000, the MEC issued a letter to Geier indicating that he violated the law and that no further action would be taken. Despite Geier's contrary assertions, the hearing under section 105.961.3, RSMo 2000 did not (and could not) have led to criminal penalties.[7] This conclusion is fatal to Geier's Sixth Amendment argument because, by its terms, the Sixth Amendment's right to a public trial applies only to criminal proceedings.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. CONST. amend. VI. Geier argues that, though the closed hearing appeared civil, in reality it was criminal or quasi-

---

[7] After the MEC found probable cause of violations of the law, under section 105.961.3, RSMo 2000 it could have referred the case to an "appropriate disciplinary authority," which could have conducted its own proceedings *See Impey*, 442 S.W.3d at 45. When no such referral takes place, the MEC may take action on its own and notify the alleged violator of its proposed action. *Id.* That is what occurred here, and the MEC notified Geier that it would take no further action.

criminal. This is unsupported by the record. The purpose of the hearing was to determine whether there was *probable cause* to believe that Geier and Stop Now! violated the reporting statutes. *See Impey*, 442 S.W.3d at 45 (noting that, under section 105.961, RSMo 2000, the MEC's purpose is "to determine whether a particular complaint is worth pursuing."). At no point were Geier or Stop Now! exposed to criminal liability under section 105.961.3, RSMo 2000. The closed hearing was not criminal or quasi-criminal. Under the Sixth Amendment, section 105.961.3, RSMo 2000 is valid both facially and as applied.

Geier also argues that the closed hearing held pursuant to section 105.961.3, RSMo 2000 violated his, Stop Now!'s, the news media's, and the general public's First Amendment rights.[8] The First Amendment provides a qualified right for the news media and general public to attend criminal trials and proceedings. *Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 603 (1982). The MEC's closed hearing, however, was not a criminal proceeding. Though some federal courts have amplified the First Amendment right of access beyond the context of criminal proceedings,[9] Geier cites no authority for the proposition that the First Amendment guarantees the public and the news media access to an investigative proceeding whose purpose is to determine whether there is probable cause that a non-criminal violation of the campaign finance disclosure

---

[8] The record is silent as to whether a member of the public or the news media sought entry to the hearing, and Geier admits that he does not know of a citizen or reporter who was turned away.
[9] *See, e.g., In re Iowa Freedom of Info. Council*, 724 F.2d 658, 661 (8th Cir. 1983) (First Amendment right of access applies to contempt proceedings, which are "a hybrid containing both civil and criminal characteristics.").

17

law occurred.  Section 105.961.3, RSMo 2000 does not violate the First Amendment facially or as applied to Geier and Stop Now!.

Section 105.961.3, RSMo 2000 is valid under the First and Sixth Amendments, and judgment was properly entered in favor of the MEC.

### D. The MEC Had Authority To Investigate Geier

Finally, Geier challenges the MEC's authority to attribute violations of the law to a PAC's treasurer.  In this case, the MEC's order stated that there was probable cause to believe that "Respondents Geier and Stop Now! violated, and have violated, [the reporting statutes]."  Further, the letter the MEC issued to Geier following the closed hearing stated that Geier violated the reporting statutes in his "capacity as Treasurer of Stop Now! Continuing Committee." Geier argues the law is ambiguous as to the MEC's authority in this regard and seeks a declaration that, if there was a violation of the reporting statutes, the violation may only be attributed to Stop Now! and not to Geier either personally or in his capacity as treasurer of Stop Now!.

The reporting statutes at issue are within chapter 130.  Section 130.058, RSMo 2000 provides that "[t]he candidate or the committee treasurer of any committee except a candidate committee is ultimately responsible for all reporting requirements pursuant to this chapter."  Under this section, Geier was responsible for Stop Now!'s reporting obligations because he was its treasurer at all relevant times.  He admits he violated the reporting statutes.  The MEC had authority, pursuant to section 130.058, RSMo 2000, to

18

investigate Geier individually for these violations on account of his responsibility as treasurer.[10]

In the alternative, Geier argues that, if the treasurer may be held liable, it must be in official capacity only. The MEC's letter of "no further action," plainly stated that Geier violated the reporting statutes "in [his] capacity as Treasurer of Stop Now! . . . ." It is unclear then, what Geier asks this Court to do in this regard, as the MEC determined that the violations of the reporting statutes were committed in his official capacity. Further, there were no monetary penalties assessed for which Geier could have been liable. Judgment on this claim was properly entered in favor of the MEC.

## IV. Conclusion

The judgment of the circuit court is affirmed.[11]

_____
Mary R. Russell, Judge

All concur.

---

[10] Geier argues that section 130.058, RSMo 2000 is ambiguous in light of section 105.963.1, RSMo Supp. 2007, a provision detailing the MEC's framework for assessing late fees against PACs that fail to comply with reporting obligations. This is irrelevant, as it is undisputed that the MEC did not fine Geier or Stop Now!.

[11] Geier also argues that the circuit court erred in denying summary judgment on his federal claims under 42 U.S.C. §§ 1983 and 1988, which supplemented his various constitutional challenges. There is no question that the claims were properly brought, but, as previously discussed, Geier has failed to establish a violation of his or Stop Now!'s constitutional rights. Judgment was properly entered in favor of the MEC on the §§ 1983 and 1988 claims.