Mary R. Russell, Judge
Article III, section 4 of the Missouri Constitution provides that a state representative must have been a “qualified voter” for two years prior to the day of the representative’s election, which necessarily means that the'representative must have been registered to vote during that time. In this appeal, Rachel Johns, a candidate for the office of state representative, challenges the “qualified voter” requirement as violating the First and Fourteenth Amendments of the federal constitution by penalizing her for engaging in protected speech, denying her access to the ballot,- burdening the voting rights of herself and other voters of District 76, and unjustifiably denying her the' equal protection of the law.
This Court finds that the “qualified voter” requirement is constitutional. Johns’ failure to register to vote does not constitute “symbolic speech” subject to First Amendment protection because it is not conduct that is inherently expressive. Nor does the requirement unjustifiably burden Johns’ right to run for office or the voting rights of Johns and the other voters in her district because it imposes only a de min-imis burden on those rights by temporarily delaying Johns’ ability to seek office and *266 the voters’ corresponding opportunity to vote for her. The “qualified voter” requirement is a state constitutional provision adopted by voters that serves the legitimate interests of requiring candidates to take certain minimal steps to demonstrate their seriousness about engaging in Missouri’s political, social, and civic processes. The judgment is affirmed.
I.Factual & Procedural Background
The facts in this case are undisputed. Rachel Johns seeks the Democratic party’s nomination for Missouri State Representative in the District 76.[1] She filed a declaration of candidacy with the Missouri Secretary of State, in which she stated under oath, that she “will qualify” to hold the office of state representative pursuant to the Missouri Constitution’s requirements for that office.
Respondent Joshua Peters,[2] another candidate for the Democratic party’s nomination for Missouri State Representative in the District 76, filed a petition pursuant to section 115.526, RSMo 2000, with the Circuit Court of the City of St. Louis seeking to disqualify Johns as a candidate and have her name removed from any official election 'ballot. Peters argued that Johns cannot meet the two-year durational voter registration requirement of article III, section 4 of the Missouri Constitution because she did not register to vote until February 4, 2015, which is less than two years before the general election date of November 8, 2016.
Although Johns agreed that she does not meet the two-year voter registration requirement, she argued that such requirement is constitutionally invalid-as applied to her. She contended the requirement, by temporarily disqualifying her from running for office, penalized her for engaging in an- act of political expression protected by the First Amendment to the United States Constitution as incorporated by the Fourteenth Amendment. Johns also argued that the requirement unconstitutionally burdened the voting’rights of herself and the voters of the District 76. The parties filed cross-motions for judgment on the pleadings. The circuit court determined that the voter registration requirement did not violate the- First or Fourteenth Amendments. Johns appeals.[3]
II.Standard of Review
The constitutional validity of a statute is a question of law subject to de novo review. Geier v. Mo. Ethics Comm’n, 474 S.W.3d 560, 564 (Mo. banc 2015). Similarly, the validity of a provision of the Missouri Constitution is also a question of law Subject to de novó review. See Brown v. Carnahan, 370 S.W.3d 637, 647 (Mo. banc 2012) (constitutional provisions are subject to the same interpretive rules as other laws).
III.Analysis

A. A “Qualified Voter” in Article III, Section I is a Registered Voter

The issue on appeal is whether the durational voter registration requirement of article III, section 4 violates the constitutional rights of Johns and the vot *267 ers of District 76.[4] Before turning to the constitutional issues, the Court must first address the meaning of the term “qualified voter” in the challenged provision. Article III, section 4 of the Missouri Constitution, titled “Qualifications of representatives,” states:
Each representative shall be twenty-four years of age, and next before the day of his election shall have been a qualified voter for two years and a resident of the county or district which he is chosen to represent for one year, if such county or district shall have been so long established, and if not, then of the county or district from which the same shall have been taken.
(emphasis added). The ACLU argues that the term “qualified voter” should not be interpreted to mean a registered voter but, rather, any individual who possesses the constitutional qualifications to vote, even if unregistered.
To determine the meaning of the term “qualified voter” and its relationship to voter registration, a brief history of the Missouri Constitution is helpful. Under the 1875 constitution, the term “qualified voter” was used .in two ways. First, as with the provision at issue here, “qualified voter” was used to describe the qualifications to hold legislative and judicial offices.[5] The second use of “qualified voter” was to describe who elected those and other officials.[6] Under the 1875 constitution, those entitled to vote were, generally, “male citizenfs] of the United States” over the age of 21 years who had, prior to the election in which they wished to vote, resided in Missouri for one year and the relevant county, city, or town for 60 days. Mo, Const, art. VIII, sec. 2 (1875). Voter registration was not listed as a requirement because, at that time, registration was required for only the most populous areas. Mo. Const, art. VIII, sec. 5 (1875).
Accordingly, under the 1875 constitution, the term “qualified voter” would have included all those who could appear at the polls and vote on election day, and whether such persons were registered depended on where they lived. There can be no doubt, however, that where registration teas in place, the fact of being registered was considered a requirement to be a qualified voter. This much is clear from this Court’s decision in State ex rel. Woodson v. Brassfield:
While the registration law was in force, they only were qualified voters whose names were placed on the registration books. This was the final, qualifying act, and no matter if a citizen possessed *268 every other qualification, if not registered, he was not a qualified voter. It was not the right to register which constituted one a qualified voter, but the fact of being registered as such, was also essential. A qualified voter is one who by law, at an election, is entitled to vote. If, by the law, a person was not entitled to vote, whether in consequence of a disability which deprived him of the right to register, or of his neglect to register with a perfect right to do so, he was equally disqualified.
67 Mo. 331, 336-37 (Mo. 1878).
That a qualified voter in an election is one who is registered when and where registration is required is further apparent under the current constitution, adopted in 1945. Article VIII, section 2 now states that all United States citizens over the age of 18 years who are residents of Missouri and of the political subdivision in which they seek to vote “are entitled to vote at all elections ... if the election is one for which registration is required if they are registered within the time prescribed by law — ” Mo. Const, art. VIII, sec. 2 (emphasis added). Because there is no question that, today, registration is required everywhere in the state to vote in a general election, the term “qualified voter” is synonymous with “registered voter” when used in the constitution to describe the electorate. And there is no indication that the drafters of the constitution intended the term “qualified voter,” when used to describe the electorate, to mean something different from when it is used as a qualification to hold office. As a result, where the constitution uses the term “qualified voter” as a requirement to hold political office, that term means registered voter. This has long been the settled interpretation in Missouri law,[7] and that interpretation is now reaffirmed.

B. Johns’ Equal Protection Argument Was Not Preserved

Recognizing that she does not meet the two-year voter registration requirement imposed by article III, section 4, Johns asserts that the voter registration requirement is invalid under the United States Constitution.[8] As an initial matter, this Court must discern precisely what constitutional challenges Johns raises and which are properly preserved for review. In her motion for judgment on the pleadings before the circuit court, Johns stated that she was raising “two distinct bases for her constitutional challenge.” First, she asserted that the requirement unconstitutionally penalized her, by disqualifying her candidacy, for engaging in protected speech — electing not to register to vote as an. act of political protest. She also argued the requirement unconstitutionally burdened both her own voting rights and the voting rights of the voters of District 76. These challenges were ruled on by the circuit court and are preserved for review.
On appeal, Johns now additionally argues that the voter registration requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by creating an unjustified classification between long-term registered voters (those registered to vote *269 for at least the two years preceding the next general election) and recently registered voters (those registered to vote for less than two years preceding the next general election).
To properly raise a constitutional challenge, a party must: (1) raise the constitutional question at the first opportunity; (2) state with specificity the constitutional provision on which the challenge rests; (3) set forth facts showing the violation; and (4) preserve the question throughout the proceedings for appellate review. Mayes v. Saint Luke’s Hosp. of Kansas City, 430 S.W.3d 260, 266 (Mo. banc 2014). This rule is intended to prevent surprise to the opposing party and to accord the circuit court an opportunity to fairly identify and rule on the issue. Id.
Johns’ pleadings undoubtedly did not state with specificity an equal protection challenge. Although she clearly stated “two distinct bases” for her challenge, an equal protection violation based on a classification between similarly situated voters was not one of them. Regardless, she asserts that her general citation of the Fourteenth Amendment was sufficient to raise her equal protection claim, as the Equal Protection Clause is embedded within that amendment. Citing the Fourteenth Amendment generally, however, does not meet the requisite specificity for preservation. The Fourteenth Amendment has several provisions, including the Due Process Clause. In light of Johns’ First Amendment claims, it is evident from her pleadings that her general citation to the Fourteenth Amendment was only as a means of applying the First Amendment to the State of Missouri, through the Due Process Clause. See Gibson v. Brewer, 952 S.W.2d 239, 246 (Mo. banc 1997) (“the First Amendment applies to the states by incorporation into the Fourteenth Amendment”).
Johns is correct that her pleadings below cited ballot access cases that employed equal protection analysis. In particular, she relied on Labor’s Educ. & Political Club-Indep. v. Danforth for the proposition that the Equal Protection Clause requires the application of strict scrutiny to a provision denying “the right to run for public office based on the particular office sought.” 561 S.W.2d 339, 348 (Mo. banc 1977). However, she did not state that she suffered an equal protection violation. Without specifically citing such a violation, it is simply untenable to argue that the circuit court was fairly presented the opportunity to decide this issue. Indeed, the circuit court’s judgment ruled on every other argument in her pleadings but did not mention equal protection.
The Court is sensitive to the accelerated timetable on which these election cases are decided. Yet the rules of preservation are clear. Because Johns failed to raise an equal protection challenge with any specificity at the earliest opportunity, it is waived. Mayes, 430 S.W.3d at 266.

C. Johns’ Failure to Register to Vote Does Not Invoke First Amendment Protection

Johns contends that the two-year durational voter registration requirement violates her rights under the First Amendment to the United States Constitution because it imposes a penalty on her— disqualifying her from running for office— for engaging in speech. The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that Congress “shall make no law ... abridging the freedom of speech.” U.S. Const. amend. I. Laws that burden political speech are subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that *270 interest, Arizona Free Enter. Club’s Freedom Club PAC v. Bennett, 564 U.S. 721, 734, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011). Johns, as the party asserting a free speech claim, must first demonstrate — beyond a “plausible contention”— that the First Amendment applies. Clark v. Cmty, For Creative Non-Violence, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).
The “speech” that Johns argues is burdened, or penalized, by the voter registration requirement is her failure to register to vote. Of course, she does not assert that intentionally failing to register to vote is literally “speech” as one might commonly understand that term. Rather, her claim falls under the “symbolic speech” jurisprudence, in which the Supreme Court has recognized that some conduct may be sufficiently expressive so as to bring it within the First Amendment’s protection. Rumsfeld v. Forum for Academic & Inst. Rights, Inc., 547 U.S. 47, 65, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). To that end, Johns argues that her failure to register to vote was an act of political expression. She asserts that she intentionally did" not register because to do so “would mean endorsing a system that had continued to fail her community”.
In arguing that her conduct of failing to register to vote was sufficiently expressive to merit First Amendment protection, Johns relies on Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). In Buckley, the Supreme Court struck down, under the First Amendment, a provision of a Colorado law that required the circula-tors of initiative petitions to be registered voters. Id. at 197, 119 S.Ct. 636. The State attempted to justify the law by asserting an interest in policing lawbreakers among petition circulators. Id. at 196, 119 S.Ct. 636. In other words, Colorado’s justification was that a voter registration re-quiremént- would- ensure that circulators of initiative petitions would be “amenable to the Secretary of State’s subpoena power.” Id. The State admitted the law burdened political speech because it reduced the number of individuals who could circulate initiative petitions. Id. at 195, 119 S.Ct. 636. It argued, however, that the burden was- minimal , because registering to vote was “exceptionally easy.” Id.
The, Supreme Court found that the State’s “ease of registration” argument missed the point because some of the plaintiffs in the case testified that they intentionally did not register to vote as an act of political protest. Id. at 195-96, 119 S.Ct. 636. Johns seizes onto this aspect of Buckley to argue that failure to register to vote is protected by the First Amendment when done fqr the purpose of political protest. Her reliance is misplaced and mis-characterizes the holding of Buckley. The Supreme Court in Buckley did not hold, nor even discuss, whether the plaintiffs’ claimed failure to register out of protest constituted expressive conduct. That was not the issue in Buckley. The speech burdened by the voter registration requirement in Buckley was. not the ability to engage in a political protest by not registering to vote; rather, it was the circulation of initiative petitions. In that regard, the Supreme Court found that the circulation of initiative petitions was “core political speech” for which First Amendment protection was “at its zenith.” Id. at 186-87, 119 S.Ct. 636. Because the speech at issue was at the core of the First Amendment’s protectionj and because the State’s interest in policing lawbreakers could be adequately met by other provisions of the Colorado law, the Supreme Court struck down the voter registration requirement. Id. at 197,119 S.Ct. 636.
*271 Buckley does not aid Johns because the Supreme Court engaged in no analysis of whether the intentional failure to register to vote constituted “symbolic speech.” This Court must now address that question. While some conduct may be sufficiently expressive to be protected under the First Amendment, the Supreme Court has rejected the view that a “limitless variety of conduct can be labeled ‘speech’ whenever the person engaging in the conduct intends thereby to express an idea.” U.S. v. O’Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Rather, First Amendment, protection extends only to conduct that is “inherently expressive.” Rumsfeld, 547 U.S. at 66, 126 S.Ct. 1297. “Inherently expressive” conduct is that which possesses sufficient communicative elements to bring the First Amendment into play. Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). This Court must ask whether “an intent to corivey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.” Id.
Johns’ failure to register to vote does not qualify as symbolic speech. On this record, the only evidence that her failure to register was motivated by a desire to protest the political system is her own statements to that effect. While this Court does not doubt the sincerity of Johns’ motivations both in abstaining from political involvement and now seeking an active role in government, the record is devoid of any communicative elements accompanying her conduct to activate First Amendment protections. The law of symbolic speech clearly teaches that there must be more than mere conduct. See, e.g., Rumsfeld, 547 U.S. at 66, 126 S.Ct. 1297 (law schools’ exclusion of military recruiters was only expressive when accompanied by explanatory speech). The failure to register .to vote is actually ■ the absence of conduct. Johns does not assert • that anyone viewed the voter registration records and observed her absence therefrom. Further, she does not allege • that she told anyone that she intentionally did not register, much less that she did so as an act of protest. Without more, there is simply no basis under the First Amendment to hold that Johns’ failure- to register as an act of protest was any different from anyone else’s failure to register simply out of neglect or indifference.[9] Because Johns’ failure to register to vote does not invoke First Amendment protection, her challenge to article III, section 4 on this basis fails.

D. Article III, Section I Does Not Violate Johns’ Candidacy or Voting Rights

Johns’ second challenge to article III, section 4’s two-year durational voter registration requirement encompasses a number of overlapping constitutional rights derived from the First and Fourteenth Amendments. When considering a challenge to a ballot access statute, the Supreme Court has set forth the applicable analysis: , .
Constitutional challenges to specific provisions of a State’s election laws therefore cannot be resolved by any “litmus-paper test” that will separate valid from invalid restrictions. Instead, a court must ... first consider the character and magnitude of the asserted injury to *272 the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiffs rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Accordingly, this Court must weigh the character and magnitude of the asserted injury against the interests put forth by the State to justify the burden imposed by the law.[10]
1. The Constitutional Rights at Issue
In beginning the analysis, it must be first determined what constitutional rights are implicated. Johns’ claim is two-fold. She argues that article III, section 4 burdens her own access to the ballot as a candidate as well as the voting rights of the voters in her district. The rights of a candidate and the rights of voters are distinct, and the difference is significant. A candidate’s right to access the ballot (i.e., run for office) is not a fundamental right.[11] The right to vote, however, is fundamental. Beil v. City of Akron, 660 F.2d 166, 169 (6th Cir. 1981). It is crucial to determine, however, what voting rights are actually implicated by a candidacy restriction.
A durational voter registration requirement as a candidacy restriction does not limit a voter’s ability to cast a vote. Regulations that limit the right to vote properly fall within the body of law addressing durational voter requirements under the United States Constitution’s “right to travel.”[12] These cases employ a different analysis than that which is required to address article III, section 4, which is a candidacy regulation because it acts to limit the number of candidates who may appear on a ballot.[13] Notwithstanding this key distinction, the Supreme Court has held that “the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.” Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Accordingly, candidacy restrictions do affect, *273 to some degree, the First Amendment associational rights of voters, sometimes referred to as the voters’ right to “cast their votes effectively.” Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). See also Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 246 (1992) (Election laws, whether they govern the qualifications of voters, the eligibility of candidates, or the voting process itself, inevitably affect “the individual’s right to vote and his right to associate with others for political ends”).[14]
2. Level of Scrutiny
Having determined the candidate and voter rights at issue, the next step is to ascertain the level of constitutional protection to which such rights are entitled. The critical inquiry here is choosing the correct level of scrutiny to apply — strict scrutiny or rational basis review. ' Under strict scrutiny, an election regulation will be upheld “only if it is narrowly tailored to serve a compelling state interest.” Arizona Libertarian Party v. Reagan, 798 F.3d 723, 729-30 (9th Cir. 2016). By contrast, under rational basis review, when an election law imposes “only reasonable, nondiscriminatory restrictions upon the First 'and Fourteenth Amendment rights of voters, the State’s important regulatory interests are generally. sufficient to justify the restrictions.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059. Under this lesser standard, the Court evaluates only “whether the requirement is justified by a legitimate interest and is a reasonable way of accomplishing this goal.” Schulz v, Williams, 44 F.3d 48, 57 (2d Cir. 1994).
The Eighth Circuit has recently noted that determining which level of scrutiny to apply is no simple task.
In considering a challenge to a ballot access statute, we are reminded ballot access statutes are not susceptible of easy analysis, nor is the appropriate 'standard of review always easy to discern. Although several cases address ballot access issues, no opinion from either the United States Supreme Court or the Eighth Circuit has clearly defined the appropriate standard for reviewing these constitutional challenges. Instead, each provides for a case-by-case assessment of the burdens and interests affected by a disputed statute....
Libertarian Party of North Dakota v. Jaeger, 659 F.3d 687, 693 (8th Cir. 2011). It is tempting to assume the application of strict scrutiny due to the implication of voting rights, regarded as “among our most precious freedoms.” Williams, 393 U.S. at 30, 89 S.Ct. 5. The Supreme Court has been clear, however, that “to subject every voting regulation to strict scrutiny ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently.” Burdick, 504 U.S. at 433, 112 S.Ct. 2059. “Accordingly, the mere fact that a State’s system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny.” Id.
Rather, it is the severity of the burden on the asserted constitutional rights that produces the level of scrutiny, and not the nature of the burdened right itself, as is often the case in traditional fundamental rights analysis. Id. at 434, 112 S.Ct. 2059. If the burden is severe, *274 strict scrutiny applies. Arizona Libertarian Party, 798 F.3d at 729-30. If the burden is de minimis, rational basis review applies. Id. With this in mind, the Court now ■ addresses the severity of the burdens placed on Johns’ candidacy and on the rights of the voters of. District 76 and weighs those burdens against the State’s interests.
3. Johns’ Access .to the Ballot as a Candidate
The burden imposed on Johns’ candidacy is not severe. Johns is now registered to vote, and' absent some change in her status,[15] she will be eligible to run for office in the next general election in 2018. This durational voter registration requirement results in a temporary burden as it delays, but does not prevent, her candidacy. It is well-settled that such a delay is a slight burden. See Clements, 457 U.S. at 967, 102 S.Ct. 2836 (requirement that a justice of the peace complete his four-year term before being eligible to run for election to the legislature did not violate the First Amendment because a waiting period “is hardly a significant barrier to candidacy”); Stiles v. Blunt, 912 F.2d 260, 265-66 (8th Cir. 1990) (requirement in article III, section 4 of Missouri Constitution that state representatives be 24 years old did not violate equal protection rights of underage putative candidate because the candidate was “not forever precluded from running”).
Article III, section 4 is also nondiscriminatory. In two related strands of ballot access cases (albeit decided under the Equal Protection Clause), the Supreme Court’s analysis has often focused on an election law’s discriminatory impact.[16] The first strand of cases''involves election laws, typically' candidate filing fee schemes, that impose burdens unique to candidates and voters of lesser economic status. Clements, 457 U.S. at 964, 102 S.Ct. 2836. The second strand involves laws that impose burdens on small political parties or independent candidates, typically requiring these parties or candidates to demonstrate a certain level of support among the electorate before obtaining a place on the ballot. Id. Though the case at hand is not decided under the Equal Protection Clause,, the Court nonetheless notes'that no such discriminatory concerns are presented by article III, section 4. The durational voter registration requirement applies to any putative candidate for state representative, regardless of economic status or political affiliation.
Given the minimal delay placed on Johns’' candidacy by article III, section 4, the provision’s nondiscriminatory impact, and the fact that the right to run for office is not fundamental,[17] rational basis review *275 applies. Accordingly, the Court must ask “whether the requirement is justified by a legitimate interest and is a reasonable way of accomplishing this goal.” Schulz, 44 F.3d at 57.
The Supreme Court recognizes that “there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.” Buckley, 525 U.S. at 187, 119 S.Ct. 636. States have a legitimate, even compelling, interest in protecting the integrity of their electoral systems from frivolous candidacies, ensuring that election processes are efficient, and avoiding voter confusion caused by an overcrowded ballot. Libertarian Party of North Dakota, 659 F.3d at 697. Johns argues that there are no actual concerns of frivolous candidacies or voter confusion presented here because she is sufficiently serious and is the only candidate opposing Peters. These concerns have repeatedly been recognized to be sufficient to justify reasonable restrictions on access to the ballot, and the State need make no showing of their actual existence in each particular case. See Munro v. Socialist Workers Party, 479 U.S. 189, 194-95, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (Supreme Court has “never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access”).
The State also argues that Missouri has an interest in encouraging candidates to show a level of commitment to the electoral process and exhibit meaningful social engagement and interest in Missouri civic affairs. At this point it must be noted that, in addition to the durational voter registration requirement, article III, section 4 also contains a requirement that state representatives be a resident of their chosen district for one year prior to election. The residency requirement ensures that state representative candidates are sufficiently familiar with the people and issues of the district they seek to represent. But the voter registration requirement is not a mere proxy residency requirement. It arguably serves a different purpose.
Unlike the residency requirement in article III, section 4, the voter registration requirement does not require a candidate to be registered in a particular district but, rather, is satisfied by two years of registration anywhere in Missouri.[18] General elections in Missouri occur every two years. As a result, this requirement addresses the seriousness of candidates in a general election by ensuring that they *276 were eligible to vote in at least one preceding general election.
Johns and the dissenting opinion suggest that the State can have no interest in encouraging legislative officials to show a minimal level of commitment to the political system before being considered a serious, or non-frivolous, candidate for office.[19] The people of Missouri clearly disagree — it is noteworthy that the durational voter registration requirement is a constitutional provision, adopted by the voters. It is not unreasonable for the people of Missouri to have decided that those who seek to govern should not, only reside in the district they seek to represent, but also should take a simple step to demonstrate sufficient seriousness about Missouri’s general election process and social and civic engagement at large. And, as discussed, the requirement has been a part of the Missouri Constitution since 1865 and has never before been challenged. While the “dead hand of the past should not be allowed to shape the future,” if the registration requirement is to be eliminated, that task is better accomplished by the voters through the constitutional amendment process, not by courts. Chimento, 353 F.Supp. at 1217 (“something more than the disappointment of one frustrated candidate is needed to erase a constitutional provision that goes back to 1784 and was never challenged until now”).
The two-year voter registration requirement is a reasonable method of addressing these legitimate interests because it ensures that a prospective legislator has taken the minimal steps necessary to be entitled to participate in the electoral process. The people of Missouri have, through multiple drafts of the state constitution, decided that a commitment to the state’s political system is some evidence of a candidate’s seriousness. In light of the fact that the State clearly cannot mandate civic involvement or voting as requirements for political office, a two-year voter registration requirement is a reasonable and minimally intrusive method of encour *277 aging such interests. Further, “registration requirements for primary election voters and candidates for political office are ‘classic’ examples of permissible regulation.” Buckley, 525 U.S. at 196, 119 S.Ct. 636. When viewed realistically, the two-year voter registration requirement acts as only a de minimis burden on Johns’ ability to participate in the election process. Accordingly, article III, section 4 does not violate the First or Fourteenth Amendment on this basis.[20]
4. Voting Rights of Voters of District 76
As with Johns’ access to the ballot as a candidate, in evaluating the impact of the voter registration requirement on the voters of District 76, the Court must look to the severity of the burden placed on voting rights to determine the level of scrutiny. Again, “the mere fact that a State’s system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny.” Burdick, 504 U.S. at 433, 112 S.Ct. 2059. Rather, when voting rights are at issue, the Court’s task is to “examine in a realistic light the extent and nature of [the candidacy restriction’s] impact on voters.” Anderson, 460 U.S. at 786, 103 S.Ct. 1564.
Johns argues that she and other voters of District 76 cannot cast their votes effectively if she is stricken from the ballot because Peters will then be the only candidate remaining on the primary ballot. The Supreme Court, however, has never held that the removal from the ballot of one candidate constituted a severe burden on voter choice. Moreover, voters do not have a right to support a specific candidate. See Anderson, 460 U.S. at 792 n. 12, 103 S.Ct. 1564 (“Although a disaffiliation provision may preclude such voters from supporting a particular ineligible candidate, they remain free to support and promote other candidates who satisfy the State’s ... requirements”); Blunt, 912 F.2d at 266 (the “fundamental rights of voting, speech, and association do not confer upon [voters] an absolute right to support a specific candidate regardless of whether he or she has satisfied reasonable eligibility requirements”); Citizens for Legislative Choice v. Miller, 144 F.3d 916, 921 (6th Cir. 1998) (“A voter has no right to vote for a specific candidate or even a particular class of candidates”). Given that this case concerns only Johns’ inability to seek the office of state representative in 2016, it cannot be said that her removal from the ballot “adversely affect[s] the democratic election process or the voters’ participation therein.” Chimento, 353 F.Supp. at 1218.
Like the de minimis burden on Johns herself, the burden on voters is also de minimis. Article III, section 4’s nondiscriminatory[21] durational voter registration requirement does not impact the right of the voters to vote, it only temporarily delays their ability to vote for Johns. Accordingly, rational basis review follows.
The State’s justification for the durational voter registration requirement’s burden on voting rights is the same as the justification it offers for the burden on Johns herself. The State’s interests in regulating the fairness of its elections and ensur *278 ing that candidates for state representative demonstrate sufficient seriousness about the electoral systems and social and civic engagement are legitimate. The two-year durational voter registration requirement is rationally related ■ to those -interests and a reasonable method of furthering them. Accordingly, article III, section 4 does not violate the First Amendment voting rights of- the -voters of District 76.
Conclusion
The circuit court’s judgment is affirmed.
Fischer, Draper, and Wilson, JJ., concur; •
Stith, J., dissents in separate opinion filed;
Breckenridge, C.J., and Teitelman, J., concur in opinion of Stith, J.

. The primary election is August 2, 2016. The person nominated will appear on the ballot for the general election on November 8, 2016.

. Peters is currently serving as the state representative from this, district and-is seeking reelection. Additionally, ■ this Court granted the State’s motion to intervene in this appeal. The American Civil Liberties Union (ACLU) also appears, as amicus, on behalf of Johns.

.Johns also challenges section 21.080, RSMo 2000 ("qualifications of representatives”), which tracks the language of article III, section 4 except that the statute requires a representative to have been a "voter” for two years rather than a "qualified voter.” When the constitution sets out the requirements for a particular office, the constitutional provision controls over any additional or different qualifications set out by the legislature. Labor’s Educ. & Political Club-Indep. v. Danforth, 561 S.W.2d 339, 343 (Mo. banc 1977). This Court holds that section 21.080 restates the requirements of article III, section 4 despite its failure to use the term "qualified.” As such, this opinion will reference only article III, section 4.

. See e.g. Mo. Const, art. IV, sec. 4 (1875) (state representatives to be qualified voters for two years prior to election); art. IV, sec. 6 (state senators to be qualified voters for three years prior to election); art. VI, sec. 26 (circuit judges to be qualified voters for three years prior to election).

. See e.g. Mo. Const, art. IV, sec. 2 (1875) (state representatives chosen every second year by qualified voters); art. IV, sec. 5 (state senators chosen by qualified voters of their districts); art. VI, sec. 5 (supreme court judges elected by qualified voters of the state); art. VI, sec. 25 (circuit court judges elected by qualified voters of each circuit).

. See Woodson, 67 Mo. at 336-37 (Mo. 1878); State ex rel. Burke v. Campbell, 542 S.W.2d 355, 357-58 (Mo.App.1976); State ex rel. Mason v. Cnty. Legislature, 75 S.W.3d 884, 887-88 (Mo.App.2002).

. This appeal is hampered by the fact that Johns’ point relied on is clearly multifarious, containing more than one basis for reversal. Multifarious points relied on are noncompli-ant with Rule 84.04(d) and preserve nothing for review. Nevertheless, this Court gratuitously exercises its discretion to review the defective point and resolve the issues on the merits.

. The case was submitted to the circuit court on stipulated facts. As a result, Johns argues that Peters stipulated to her assertion in her pleadings that the decision not to register to vote was an “expressive act, of protest.” Despite this stipulation, it is still a- question of law for the circuit court as to whether her conduct merited First Amendment protection.

. Although, as stated above, this opinion is based directly on the First and Fourteenth Amendments and does not engage in a separate Equal Protection Clause analysis, this decision necessarily relies, as did the Anderson Court, on the analysis of a number of cases applying the "fundamental rights” strand of equal protection law. See Anderson, 460 U.S. at 786 n. 7, 103 S.Ct. 1564.

. Both this Court and the United States Supreme Court have held that the right to seek office is not fundamental, and Johns does not disagree. See Coyne v. Edwards, 395 S.W.3d 509, 517 (Mo. banc 2013) (citing Clements v. Fashing, 457 U.S. 957, 964-65, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)).

. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 360, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (Tennessee durational voter requirement violated the Equal Protection Clause because it burdened, without a compelling justification, the voting rights of bona fide residents who had recently moved to the state).

. See Thournir v. Meyer, 909 F.2d 408, 412 (10th Cir. 1990) ("election laws impacting upon the travel freedoms which have been invalidated by Dunn are not analogous to the statutes imposing burdens on candidacy”).

. Despite the fact that the voters of District 76 are not parties to this case, Johns has standing to assert their rights because, although she is a putative candidate, she also is herself a voter of District 76. See McLain v. Meier, 851 F.2d 1045, 1048 (8th Cir. 1988) (because he was a voter, candidate had a sufficient personal stake in the outcome of a challenge to state’s ballot access laws).

. While Missouri does not provide for an . individual to un register to vote, Johns could lose her right to vote if she were adjudged .incapacitated, incarcerated, on probation or parole after commission of á felony, or convicted of a'crime connected with "the right of suffrage.” Section 115.133.2, RSMo Supp. 2013.

. See Turner v. Fouche, 396 U.S. 346, 363, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (there is a "federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications”).

. See Coyne, 395 S.W.3d at 517. Furthermore, the inability to run for state representative does not impact the right to travel, as the dissenting opinion suggests. In Chimento v. Stark, the New Hampshire District Court upheld the state -constitution’s seven-yéar residency requirement for gubernatorial candidates. 353 F.Supp. 1211, 1218 (D.N.H.1973), aff'd without opinion, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973). The court found that it "cannot be seriously argued that the inability to run for Governor is a real impediment to interstate travel.” Id. The court found that the candidate residency re *275 striction was unlike the voter residency restriction at issue in Dunn, where the voter residency requirement in fact disenfranchised a large number of people. Id. “While the Governorship of New Hampshire may be a coveted prize, it is one that is seriously sought after by only a very few.” Chimento, 353 F.Supp. at-1218.

. Article III, section 4 does not on its face require two years of voter registration in Missouri. The two-year durational voter registration requirement first appeared in the 1865 Missouri Constitution. It originally required a state representative to be “a qualified voter of this state two years.” Mo. Const, art. IV, sec. Ill (1865) (emphasis added), When the 1945 constitution was adopted, voters chose to omit the language "of this state.” Mo. Const, art. Ill, sec. 4 (1945). The Court declines to specifically hold that registration outside of Missouri would satisfy the requirement as that question is not before the Court. However, the removal of the language "in this state” perhaps further underscores the notion that the provision has little to do with residency but, rather, is concerned with social and civic engagement.

. In arguing that voter registration bears no relationship to a candidate’s seriousness, the dissenting opinion relies on Gangemi v. Ro-sengard, in which the Supreme Court of New Jersey struck down, on state equal protection grounds, a law requiring elected municipal officers in first class cities to be registered voters for two years prior to election. 44 N.J. 166, 207 A.2d 665 (1965). That case is of little value here, as the Gangemi court struck down the law because it applied only to certain municipalities based on population and whether they were classified as a "city.” Id. at 670. Article III, section 4, makes no such arbitrary classification, and so Gangemi is of little help in evaluating the strength of the State’s interest here. More persuasive is Peters’ citation of Broadwater v. State, in which the Maryland court of appeals recognized that “it would be anomalous for those who make and enforce the laws ... to have so little interest in public affairs as not to be registered.” 306 Md. 597, 510 A.2d 583, 588 (1986).
Similarly, Johns relies on Henderson v. Fort Worth Indep. Sch. Dist., in which the Fifth Circuit struck down, under the Equal Protection. Clause, a local statute requiring school board officials to be registered voters in the district for three years prior to election. 526 F.2d 286, 293 (5th Cir. 1976). In that case, the State's justification for the statute was a desire for knowledgeable candidates able to handle the complex matters of the office. Id. at 292. The court was not persuaded, finding that voter registration was a “crude index” for such qualifications and that the regulation likely disqualified a significant number of residents of the district from the office. Id. Again, this case is meaningfully distinct. The State here does not argue that voter registration is related to any specific skill or knowledge inherent in serving as a capable legislator. Rather, the State believes that eligibility to vote in one preceding general election is some minimal evidence that a candidate is serious about Missouri’s political system. Indeed, this is perhaps why the voter registration requirement, unlike that at issue in Henderson, does not require a candidate to be registered in his respective district for two years.

. The State also argues that it was Johns’ voluntary decision not to register to vote. Because she is presumed to know the law, the State posits that she was aware of the dura-tional voter registration requirement for candidacy for state representative and cannot now complain.

. As previously discussed, the provision would temporarily delay any candidate who did not timely register to vote, regardless of the candidate’s economic status or political affiliation.